JOHN RICHARDSON & others[1] *vs*. SHERIFF OF MIDDLESEX COUNTY.

Middlesex. February 7, 1990. - May 17, 1990.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, & LYNCH, JJ.

*Imprisonment*, Overcrowding. *Practice, Civil*, Appeal, Parties. *Administrative Law*, Regulations. *Constitutional Law*, Cruel and unusual punishment. *Due Process of Law*, Pretrial detainees. *Judge. Words*, "Punishment," "Genuine privation and hardship."

In the circumstances of an action seeking injunctive relief to alleviate overcrowding at a county jail, violations of Department of Correction and Department of Public Health regulations, by themselves, did not constitute sufficient grounds to grant the relief requested. [459-460]

Discussion of the nature of conditions of confinement of pretrial detainees that would warrant the conclusion that such constituted punishment in contravention of their due process rights. [461-462]

Failure of a county sheriff to provide beds for pretrial detainees in a county jail, failure to provide sufficient or adequate toilet and shower facilities for such inmates, holding of inmates in overcrowded common areas designed for other purposes, and double-bunking of detainees in small temporary holding cells were each conditions of confinement amounting to genuine privation and hardship [462-465] and were not reasonably related to a legitimate governmental objective, thus constituting a violation of the detainees' due process rights [465-467].

In a proceeding seeking injunctive relief from overcrowded conditions at a county jail, the judge properly ordered a population limit or "cap" at the jail as well as certain other narrowly tailored relief; the case was remanded for further consideration of other remedies to alleviate the violation of the inmates' constitutional rights. [467-469]

The Commissioner of Correction was a proper party to be joined as a party defendant pursuant to Mass. R. Civ. P. 19 (a), in an action concerning unconstitutional conditions at a county jail; however, the county commissioners were not necessary parties. [469-471]

.

---

[1] A class of pretrial detainees held at the Middlesex County jail.

CIVIL ACTION commenced in the Superior Court Department on September 23, 1988.

The case was heard by *Robert J. Hallisey*, J., on statements of agreed facts, and a motion to amend judgment pending appeal was heard by him.

The Supreme Judicial Court granted a request for direct appellate review.

*Richard M. Zielinski* (*David B. Deitch & Lee J. Gartenberg* with him) for the plaintiffs.

*Richard L. Barry, Jr.* (*Ellen M. Dente* with him) for the defendant.

*Nancy Ankers White*, Special Assistant Attorney General, & *Michael H. Cohen*, for Department of Correction, amicus curiae, submitted a brief.

ABRAMS, J. This is an appeal from a judgment enjoining the defendant, the sheriff of Middlesex County, from continuing certain practices instituted as a result of overcrowding at the Middlesex County jail (jail). The sheriff claims error in the judge's conclusion that conditions of confinement at the jail violated the plaintiffs' constitutional rights, and in the denial of his motion to compel joinder of additional defendants pursuant to Mass. R. Civ. P. 19, 365 Mass. 765 (1974). The plaintiffs, a class of pretrial detainees at the jail, cross appealed from the judgment and the denial of their motion to amend judgment pending appeal. The plaintiffs, in their cross appeal, argue that the judge should have ordered two special criminal sessions for persons detained and awaiting trial, and a special bail review session for persons held on $500 bail or less and for all detainees who can raise fifty per cent of their bail. We granted the plaintiffs' application for direct appellate review. We affirm the trial judge's judgment concerning liability and his order, and we remand the case for such further proceedings as may be needed at this time.

The case was submitted on statements of agreed facts. On motion of the plaintiffs, the judge also took a view of the conditions at the jail. The jail, a modern structure designed to hold 161 inmates, has for several years held many more prisoners than it was designed to accommodate. In Septem-

ber, 1988, for example, the population of the jail ranged from 261 to 303 inmates. As a result, several inmates were forced to sleep on the floor, some without mattresses. Inmates also were placed in the visiting rooms, common areas, and other spaces that were not designed to house inmates. In one dayroom, sixty-two inmates were housed together. In these makeshift rooming areas, inmates were provided with bunk beds placed extremely close together. Some of these areas lacked bathrooms.[2] Some inmates were housed on floor mattresses in a ground level area, adjacent to a garage, designed to hold temporarily prisoners awaiting transportation to and from court. In this ground level area, prisoners were "double-bunked" in small single-occupancy cells.

During the day, inmates who were not occupying cells stayed in an area immediately outside the cells, sitting on picnic tables or on the floor. Here, also, there was no access to bathrooms. An inmate needing to use a toilet had to get permission — not always forthcoming — from an inmate in a cell to use his, or had to gain access to another area in the jail, such as a recreational area, to use the toilet.

The judge found that "[t]he facts, as stipulated, indicate clear violations of [Department of Correction and Department of Public Health] regulations." The judge found violations of 103 Code Mass. Regs. § 972.03 (1986), which sets standards for multiple occupancy cells and dormitories;[3] 103

---

[2]In an affidavit submitted to the court, one prisoner averred that he was forced to urinate into a plastic bag because no toilet was available.

[3]Section 972.03 provides: "Multiple occupancy cells or dormtories shall be used only for housing inmates engaged in work release or similar programs.

"(1) Multiple occupancy cells or dormitories shall have a maximum capacity of fifty (50) inmates.

"(2) Multiple occupancy cells or dormitories shall have at least sixty (60) square feet of floor space for each inmate and where double bunks are used, a minimum ceiling height of nine (9) feet.

"(3) At least one toilet and washbowl shall be provided for each eight (8) inmates or fraction thereof housed in multiple occupancy cells or dormitories.

"(4) Multiple occupancy cells or dormitories shall be divided by partitions into single occupancy cubicles to provide adequate privacy. Each cu-

Code Mass. Regs. § 972.07 (1986), which sets standards for the provision of toilets and showers;[4] 105 Code Mass. Regs. § 451.104 (1986), which requires that every inmate be supplied with a bed; 105 Code Mass. Regs. § 451.110 (1986), which requires that adequate and conveniently located toilet facilities be provided for all inmates; 105 Code Mass. Regs. § 451.112 (1986), which requires that each inmate have access to a toilet and handwashing facilities at all times; and 105 Code Mass. Regs. § 451.114 (1986), which requires at least one working toilet and sink for every ten inmates.

After having taken a view of the conditions at the jail on the night of November 9, 1988, the judge found that "[a]reas that were designed for day rooms, libraries and other such facilities, including a sick bay, were being used to house the Jail inmates. In one particular section sixty (60) men were being housed with access to only two toilets and one shower. The crowding seemed to me to contain all the ingredients for a riot."

The judge, while noting that the sheriff had made "conscientious efforts" to comply with his legal obligations, concluded that the conditions in the jail violated the due process rights of the detainees.[5] Accordingly, he ordered as follows: "Judgment should enter enjoining defendant[:] 1. From allowing inmates to sleep on the floor. Every inmate shall be furnished with a bed. 2. From allowing more than one inmate to be housed in a cell. 3. From allowing inmates to be

---

bicle shall have a bed, desk, chair, and storage space for personal belongings."

[4]Section 972.07 provides: "(1) There shall be at least one toilet in every single or multiple occupancy cell or dormitory. In the dayroom and indoor exercise areas, there shall be wash basins available on a ratio of one wash basin for every eight (8) inmates or fraction thereof.

"(2) There shall be at least one (1) shower available for every fifteen (15) inmates or fraction thereof."

[5]The judge also concluded that these conditions violated the detainees' rights under the Massachusetts Declaration of Rights and the Eighth Amendment to the United States Constitution. Because the judge's conclusion that the detainees' due process rights were violated is adequate to support the relief ordered, we need not address these conclusions.

housed in or to sleep in the cells on the [ground floor] except
for any purpose relating to the transportation of prisoners to
and from the jail. 4. From allowing inmates to be housed on
or to sleep anywhere on the 17th floor except for any purpose
relating to the transportation of prisoners to and from the
jail. 5. From housing inmates in any multiple occupancy cell
or dormitory where there is not at least one toilet and wash
bowl for each eight (8) inmates [citing 103 Code Mass.
Regs. § 972.03(3)]. 6. From housing inmates in any area
where there is not at least one shower for each fifteen (15)
inmates [citing 103 Code Mass. Regs. § 972.07(2)]. 7. From
housing inmates in the 18th floor day room [citing 103 Code
Mass. Regs. § 972.6]. 8. From housing inmates in the 20th
floor day room [citing 103 Code Mass. Regs. § 972.06]. 9.
To reduce the total population of the jail as follows: (a) To
260 immediately, (b) To 240 within sixty days of the issu-
ance of this order, (c) To 220 within one hundred twenty
days of the issuance of this order, (d) To 200 within one hun-
dred eighty days of the issuance of this order, (e) Transfer
all inmates who may be transferred under the provisions of
M.G.L. c. 276, § 52A, (f) Remand those inmates with parole
violations behind bail to the custody of the parole board,[6] (g)
Work with the courts and other agencies to establish a pre-
trial diversion program whereby prisoners will be condition-
ally released while awaiting trial, (h) Release eligible in-
mates to halfway houses."

1. *Violation of State regulations.* In their brief, the plain-
tiffs argue that relief should be granted solely because the
conditions at the jail violated State regulations. Nothing in
the record before us indicates that the plaintiffs argued below
that the regulatory violations, by themselves, were sufficient
grounds for an injunction. The judge also did not base his
decision solely on the fact that regulations had been violated.
Indeed, at oral argument, the plaintiffs' counsel conceded

---

[6]By this, the judge meant that the sheriff should transfer to the custody
of the parole board any detainees who, if they made bail, would then be
held for parole violations.

that the judge's order was not based solely on the regulations, because, as plaintiffs' counsel noted, the judge "did not order literal compliance with the regulations." In these circumstances, it is inappropriate for us to decide the case solely on the basis of the regulatory violations. "The theory of law on which by assent a case is tried cannot be disregarded when the case comes before an appellate court for review." *Santa Maria* v. *Trotto*, 297 Mass. 442, 447 (1937).

The plaintiffs also appear not to seek literal compliance with the regulations. For example, they have not objected to the sections of the judge's order that permit housing in multiple-occupancy areas, despite the fact that the regulations prohibit entirely the housing of pretrial detainees in multiple-occupancy areas. See 103 Code Mass. Regs. § 972.03. The plaintiffs' counsel also said in oral argument that "literal compliance with the State regulations would probably require the closing down of this facility." Nothing before us indicates that the plaintiffs have ever sought such a result. The plaintiffs give us no guidance on how to base our decision on the regulations when literal compliance is not, apparently, what they seek. Thus, as in *Michaud* v. *Sheriff of Essex County*, 390 Mass. 523, 526-527 (1983), we are faced with a case in which it would be inappropriate to render a decision purely on the basis of the violation of regulations.

We do, however, accord the regulations some weight in our consideration of the constitutional issues because "State regulations governing conditions of confinement reflect current standards of decency against which we measure alleged [constitutional] violations." *Id.* at 527. We note, however, that "the mere failure to conform to State minimum standards does not *per se* establish a constitutional violation. Certainly such standards may be designed to provide conditions of incarceration far better than those constitutionally mandated." *Strachan* v. *Ashe*, 548 F. Supp. 1193, 1202 (D. Mass. 1982).[7]

---

[7]After judgment entered, the sheriff applied for and received from the Commissioner of Correction a waiver of some of the regulations that the

2. *Due process.* Unlike convicted prisoners, who may be punished as long as the punishment is not "cruel and unusual" under the Eighth Amendment to the United States Constitution, pretrial detainees may not be punished at all. *Bell* v. *Wolfish*, 441 U.S. 520, 535 n.16 (1979). "[U]nder the Due Process Clause, a [pretrial] detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Id.* Accordingly, "the dispositive inquiry is whether the challenged condition, practice, or policy *constitutes punishment*" (emphasis added). *Block* v. *Rutherford*, 468 U.S. 576, 583 (1984). This inquiry turns on whether the conditions of confinement are "reasonably related to a legitimate governmental objective . . . . [I]f a restriction or condition is not reasonably related to a legitimate goal — if it is arbitrary or purposeless — a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees. . . ." *Bell* v. *Wolfish*, *supra* at 539.

Significantly, although it held that the conditions then before it in *Bell* v. *Wolfish* did not constitute punishment, the Supreme Court declared that "confining . . . people . . . in such a manner as to cause them to endure genuine privations and hardship over an extended period of time might raise serious questions under the Due Process Clause as to whether those conditions amounted to punishment." *Id.* at 542. Thus, in order to conclude that overcrowded conditions of confinement at a jail constitute punishment, "[i]t must be shown that the overcrowding subjects a detainee over an extended period to genuine privations and hardship not reasonably related to a legitimate governmental objective." *Lareau* v. *Manson*, 651 F.2d 96, 103 (2d Cir. 1981).[8] Accord *Inmates*

---

judge found were violated. Because this purported waiver occurred after entry of judgment, it is not properly before us, as plaintiffs' counsel observed during oral argument. The waiver does not, of course, excuse the sheriff from compliance with the judge's order.

[8]In *Lareau* v. *Manson*, *supra*, the court considered relevant the length of time during which inmates are exposed to conditions. The sheriff points to a statistic not in the record indicating that the *average* length of stay is

*of the Allegheny County Jail* v. *Wecht*, 699 F. Supp. 1137, 1143 (W.D. Pa. 1988), appeal dismissed, 873 F.2d 55 (3d Cir. 1989); *Reece* v. *Gragg*, 650 F. Supp. 1297, 1301 (D. Kan. 1986); *Albro* v. *County of Onondaga*, 627 F. Supp. 1280, 1285 (N.D.N.Y. 1986). The plaintiffs argue that several conditions of confinement, resulting from overcrowding, subjected them to "genuine privations and hardship." We consider these conditions under this standard and then turn to the question whether the conditions were "reasonably related to a legitimate governmental objective."

a. *Conditions.*

i. *Failure to provide beds.* The plaintiffs argue that the sheriff's failure to provide beds for all inmates, so that some were required to sleep on floor mattresses, and some without any mattresses at all, constituted a genuine hardship. The sheriff concedes that this practice was improper. See defendant's brief at 23. We agree. The use even of floor mattresses "constitute[s] punishment without regard to the number of days for which a prisoner is so confined." *Lareau* v. *Manson, supra* at 105. Accord *Anela* v. *Wildwood*, 790 F.2d 1063, 1069 (3d Cir.), cert. denied, 479 U.S. 949 (1986); *Vazquez* v. *Gray*, 523 F. Supp. 1359, 1365 (S.D.N.Y. 1981). See also *Lyons* v. *Powell*, 838 F.2d 28, 30 (1st Cir. 1988); *Union County Jail Inmates* v. *DiBuono*, 713 F.2d 984 (3d Cir. 1983), cert. denied, 465 U.S. 1102 (1984); *Balla* v. *Board of Corrections*, 656 F. Supp. 1108, 1118 (D. Idaho 1987); *Inmates of the Allegheny County Jail* v. *Wecht*, 565 F. Supp. 1278 (W.D. Pa. 1983).[9] Certainly, then, requiring inmates to

---

sixteen days. We do not consider this information, because it is not properly before us, although we note that an average length of stay is often a misleading statistic where there is a high turnover of "shorttimers" among detainees. If sixteen days is the average, many inmates may be incarcerated for longer periods. See *id.* at 102. We also note that Mass. R. Crim. P. 36 (b) (1), 378 Mass. 909 (1979), requires that defendants be brought to trial within one year of the return date. This time period is extended if a defendant requests a continuance. Certainly one year is a significant period of time in which to be exposed to genuine privation or hardship.

[9]In his reply brief, the sheriff contradicts the position in his principal brief that the use of floor mattresses is improper. In the reply brief, he

sleep on floors without any mattresses at all is a genuine privation or hardship.

ii. *Limited access to bathroom facilities.* The plaintiffs contend that their detention in certain areas of the jail that lacked bathrooms, and their detention in other areas in which there were not enough toilets and showers, constituted genuine privation and hardship.[10] They are correct. Indeed, this court, as well as several others, has held that the failure to provide an inmate with a toilet that can be flushed from within the inmate's cell constitutes cruel and unusual punishment in violation of the Eighth Amendment. See, e.g., *Michaud* v. *Sheriff of Essex County*, 390 Mass. 523 (1983); *Knop* v. *Johnson*, 667 F. Supp. 467, 477-484 (W.D. Mich. 1987), appeal dismissed, 841 F.2d 1126 (6th Cir. 1988); *Lovell* v. *Brennan*, 566 F. Supp. 672, 695-696 (D. Me. 1983), aff'd, 728 F.2d 560 (1st Cir. 1984); *Strachan* v. *Ashe*, 548 F. Supp. 1193, 1202 (D. Mass. 1982). Certainly, such a practice is "punishment" within the ambit of *Bell* v. *Wolfish.* See *Flakes* v. *Percy*, 511 F. Supp. 1325, 1337 (W.D. Wis. 1981). Cf. *DiMarzo* v. *Cahill*, 575 F.2d 15, 16 (1st Cir.), cert. denied sub nom. *Hall* v. *DiMarzo*, 439 U.S. 927 (1978). The principle that every inmate in an individual cell should have access to a toilet is no less applicable to inmates housed in multiple-occupancy areas. There is no constitutionally significant difference between the two situations.

Moreover, plainly insufficient or inadequate toilet and shower facilities also constitute "punishment." See *Fischer* v. *Winter*, 564 F. Supp. 281 (N.D. Cal. 1983) (failure to add bathroom facilities when jail's population was double the design capacity of jail constituted punishment). Cf. *Preston* v.

---

contends that the use of floor mattresses was acceptable because of an "emergency." Nothing in the record lends support to the theory that there was a sudden emergency. Because this argument is unsupported by the record, we do not address the question whether the use of floor mattresses is acceptable in emergency circumstances.

[10]The sheriff's contention that the plaintiffs' access to bathrooms was adequate is not supported by the record and is expressly contradicted by the judge's findings.

*Thompson*, 589 F.2d 300 (7th Cir. 1978) (order requiring that prisoners be permitted to shower at least twice per week upheld); *Inmates of the Allegheny County Jail* v. *Wecht*, 565 F. Supp. 1278 (W.D. Pa. 1983) (arrangement in which detainees had to use another prisoner's toilet or request staff assistance to gain access to toilet part of totality of overcrowded conditions constituting punishment). The judge's observations that in some areas there were as many as sixty men confined with access to only two toilets and one shower provide ample support for his conclusion that the lack of facilities in the multiple-occupancy areas rose to the level of punishment.

iii. *Overcrowding of multiple-occupancy areas.* The plaintiffs contend that the judge's findings on this issue support the conclusion that they were subjected to punitive conditions. We agree. Courts have held that the crowding of inmates into common areas designed for other purposes may constitute punishment, particularly when those common areas originally were designed and used as open or recreational space for inmates. See, e.g., *Lareau* v. *Manson*, 651 F.2d 96, 105 (2d Cir. 1981) ("when a detainee is subjected for a substantial length of time to the combination of double-bunked cells, overcrowded dayrooms and strained prison services . . . he is being unconstitutionally punished"); *Campbell* v. *Cauthron*, 623 F.2d 503, 505-506 (8th Cir. 1980) (detainees held in closely crowded multiple-occupancy cells were unconstitutionally punished); *Inmates of the Allegheny County Jail* v. *Wecht*, 565 F. Supp. 1278 (W.D. Pa. 1983) (conditions amounted to "punishment" when male detainees were held in gymnasium with only twelve inches between cots and female detainees were "crammed" into common areas).

iv. *Double-bunking.* The plaintiffs contend that double-bunking resulted in genuine privation and hardship. The sheriff, however, points out that the United States Supreme Court has approved double-bunking in some situations, ruling that there is no " 'one man, one cell' principle lurking in the Due Process Clause." *Bell* v. *Wolfish, supra* at 542. Many courts considering the issue since *Bell* v. *Wolfish* have

decided that double-bunking is, nonetheless, unconstitutional in some circumstances, particularly where the cells in which prisoners are double-bunked are very small, as were the cells in this case.[11] In *Lareau* v. *Manson, supra,* for example, the court ruled improper the double-bunking of inmates in cells of sixty or sixty-five square feet, particularly because the common and recreational areas of the facility were also extremely crowded.

In this case, the cells in which the detainees were double-bunked were designed as temporary holding cells for inmates awaiting transportation. As a result, they contain large benches that effectively reduce the floor area, which also contains a toilet, to as little as approximately forty-two square feet. As in *Lareau* v. *Manson, supra,* the common areas of the jail also were overcrowded and provided no respite from the extremely cramped conditions in the double-bunked cells.

Indeed, some courts have held that conditions such as these not only are punishment, but are cruel and unusual punishment. In *French* v. *Owens,* 777 F.2d 1250, 1253 (7th Cir. 1985), cert. denied, 479 U.S. 817 (1986), the court ruled that where double-celling resulted in only twenty-four square feet of space per inmate, it was a violation of the Eighth Amendment rights of the prisoners. Similarly, in *Toussaint* v. *Yockey,* 722 F.2d 1490 (9th Cir. 1984), the court upheld a preliminary injunction forbidding double-bunking in cells of less than fifty square feet. Cf. *Inmates of the Suffolk County Jail* v. *Kearney,* 734 F. Supp. 561 (D. Mass. 1990) (refusing to modify a consent decree to permit double-bunking in cells of approximately seventy square feet). We follow the weight of authority in this area and conclude that the double-bunking constituted genuine privation and hardship.

b. *Governmental objectives.* Having established that the conditions of confinement amounted to genuine privation and hardship, we turn to the question whether the conditions

[11]Indeed, one court concluded that even single-bunked prisoners in extremely small cells were impermissibly punished when they were confined to those cells for twenty-two hours per day. See *Lock* v. *Jenkins,* 641 F.2d 488 (7th Cir. 1981).

were "reasonably related to legitimate governmental objectives." *Block v. Rutherford*, 468 U.S. 576, 586 (1984). See *Lareau v. Manson*, 651 F.2d 96, 103 (2d Cir. 1981). If not so related, the conditions constituted punishment, in violation of the detainees' due process rights. *Bell v. Wolfish*, 441 U.S. 520 (1979). "The Government . . . has legitimate interests that stem from its need to manage the facility . . . . Restraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting . . . ." *Id.* at 540. The sheriff cites as his principal objective the need to keep the facility operating so as to detain unbailworthy defendants awaiting trial.

While we are not unmindful of the difficult situation that the Statewide overcrowding problem has caused for the sheriff, his proffered rationale for the conditions at the jail sweeps too broadly. Legitimate governmental interests include measures necessary to the security and effective maintenance of a facility, see *id.* and *Block v. Rutherford, supra*, not to its continued operation in an overcrowded state. As in *Lareau v. Manson, supra*, "[t]he only conceivable purpose overcrowding . . . serves is to further the state's interest in housing more prisoners without creating more prison space. This basically economic motive cannot lawfully excuse the imposition on the presumptively innocent [pretrial detainees] of genuine privations and hardship over any substantial period of time . . . ." *Id.* at 104. Accord *Morales-Feliciano v. Parole Bd. of P.R.*, 887 F.2d 1, 5 (1st Cir. 1989), cert. denied sub nom. *Hernandez Colon v. Morales-Feliciano*, 110 S. Ct. 1511 (1990); *Campbell v. Cauthron*, 623 F.2d 503, 508 (8th Cir. 1980); *Reece v. Gragg*, 650 F. Supp. 1297, 1303 (D. Kan. 1986).

Indeed, we rejected a similar argument in *Michaud v. Sheriff of Essex County*, 390 Mass. 523, 532 (1983). There, the sheriff claimed that the conditions in the jail had a "penological justification[:] . . . the very existence of the correctional facility." In response, we held that "[w]e flatly reject the notion that an arm of the State may be allowed to violate

an individual's constitutional rights because funds have not been appropriated to remedy the wrong." *Id.* at 532. "[B]udgetary constraints ordinarily do not, in and of themselves, provide a legal excuse for noncompliance [with constitutional requirements]." *Morales-Feliciano* v. *Parole Bd. of P.R., supra* at 5. "We cannot permit unconstitutional conditions to exist simply because prison officials cannot . . . spend the money necessary to fulfill constitutional requirements. We note, moreover, that increasing the budget is not the only means to guarantee compliance with the Constitution. Overcrowding, for instance, may be eliminated by prudent changes in bail . . . policies." *Campbell* v. *Cauthron, supra* at 508. Accordingly, we conclude that the conditions were not reasonably related to a legitimate governmental objective, and we agree with the trial judge that the plaintiffs' due process rights were violated.

3. *Propriety of remedial order.* The plaintiffs appeal the judge's denial of their motion to amend judgment pending appeal.[12] They ask that we supplement the trial judge's order with further remedial measures, in particular, the institution of special trial and bail sessions, which, they argue, will result in more effective administration of the remedies already ordered. The sheriff asks that we vacate or raise the population cap, but he also appears to agree with the plaintiffs that some further remedial action is necessary. In his reply brief, the sheriff, while continuing to argue that conditions at the jail are not unconstitutional, stated that he "is committed to a long-range continuing effort to deal effectively with the overcrowding situation, and would welcome the institution of special criminal trial sessions and additional resources to solve this overcrowding emergency." The trial judge also requested guidance from us concerning remedies. He wrote in his memorandum of decision and report that "[h]aving doubts about the propriety of my order, and of its enforce-

___

[12]In the motion to amend judgment pending appeal, the plaintiffs sought special criminal sessions and a special bail review session in order to reduce the number of detainees awaiting trial to meet the population cap in the judge's order.

ability, and . . . being convinced that the problem calls for centralized state wide solution, and in the hope that the Supreme Judicial Court may be ready to exercise its inherent powers, I report my order to the Appeals Court."

As far as the propriety of the remedial measures already ordered is concerned, we conclude that the judge was well within his powers in ordering a population limit or "cap" at the jail. See *Perez* v. *Boston Hous. Auth.*, 379 Mass. 703 (1980) (affirming trial judge's order appointing receiver for housing authority). Many courts have held that population caps are particularly appropriate remedial measures in jail overcrowding cases. See, e.g., *Monmouth County Correctional Inst. Inmates* v. *Lanzaro*, 717 F. Supp. 268 (D.N.J. 1989) (explaining earlier population cap order); *Balla* v. *Board of Corrections*, 656 F. Supp. 1108 (D. Idaho 1987) (imposing population caps); *Libby* v. *Marshall*, 653 F. Supp. 359 (D. Mass. 1986) (detailing history of population cap), appeal dismissed, 833 F.2d 402 (1st Cir. 1987); *Reece* v. *Gragg*, 650 F. Supp. 1297 (D. Kan. 1986) (imposing population cap); *Benjamin* v. *Malcolm*, 495 F. Supp. 1357 (S.D.N.Y. 1980) (imposing population cap). The rest of the judge's order also is appropriate and is narrowly tailored to his findings. See *DiMarzo* v. *Cahill*, 575 F.2d 15, 19 (1st Cir. 1978) (approving narrowly tailored remedy as appropriate).

We also agree with the plaintiffs, however, that further remedial measures may be necessary. The judge evidently was reluctant to order further remedies because of uncertainty concerning the extent of his powers, and it is clear that he could not, by himself, order special sessions. We note that he did order that the sheriff was to "[w]ork with the courts . . . to establish a pretrial diversion program whereby prisoners will be conditionally released while awaiting trial. . . ." Accordingly, we remand the case to the trial judge for further consideration of other remedies. If he determines that the special sessions requested by the plaintiffs are the most appropriate remedial measures to bring the jail within compliance with the other aspects of his order, he should request

that the Administrative Justice of the Superior Court insti-
tute such special sessions. If necessary, the assistance of the
Chief Administrative Justice of the Trial Court should be
sought. We will not order such special sessions without fur-
ther consideration by the trial judge because he is in a better
position than an appellate court to determine whether such
sessions are appropriate at this time. See *Battle* v. *Anderson*,
564 F.2d 388, 400 (10th Cir. 1977) (deferring to the judg-
ment of trial court).

4. *Joinder of additional parties*. Before trial, the sheriff
filed a motion to compel joinder of additional defendants, in-
cluding the Commissioner of Correction and the county com-
missioners of Middlesex County. See Mass. R. Civ. P. 19
(a), 365 Mass. 765 (1974). The plaintiffs assented to the mo-
tion, but the judge denied it. The sheriff contends that the
judge erred in refusing to join these additional defendants.

Rule 19 (a) provides for joinder of a party if "in his ab-
sence complete relief cannot be accorded among those al-
ready parties . . . ." The sheriff contends that the Middlesex
county commissioners are necessary parties because under
G. L. c. 34, § 3, counties are to provide suitable jails, and
because under G. L. c. 34, § 14, county commissioners "may
provide for erecting and repairing jails." We disagree that
the county commissioners are necessary parties. The plain-
tiffs have not sought relief through expansion or renovation
of the jail, nor did the trial judge grant any relief implicating
the duties of the county commissioners. There was no error
in refusing to join the county commissioners.

The sheriff also argues that the Commissioner of Correc-
tion is a necessary party, because under the terms of the cur-
rent remedial order, the sheriff is ordered to "[t]ransfer all
inmates who may be transferred under the provision of
M.G.L. c. 276, § 52A . . . ."[13] Moreover, the Commissioner

[13]General Laws c. 276, § 52A, provides, in relevant part, "Persons held
in jail for trial . . . shall, by order of a justice of the superior court, be
removed by the commissioner of correction to a jail in another county
. . . ." The sheriff has submitted to us a letter from the Acting Commis-
sioner of Correction indicating that the Department of Correction will not

of Correction has supervisory responsibility for State and county correctional facilities, see G. L. c. 124, § 1, and is charged with promulgating minimum standards for the "care and custody of all persons committed to county correctional facilities." G. L. c. 127, § 1A. See *DiMarzo* v. *Cahill*, 575 F.2d 15, 17 (1st Cir. 1978). Indeed, the Commissioner "has statutory responsibility over precisely the conditions giving rise to the violations." *Id.* We will not permit unconstitutional conditions to be perpetuated "out of an overly-nice solicitude for the division of powers and duties between county and state officials." *Inmates of Suffolk County Jail* v. *Eisenstadt*, 494 F.2d 1196, 1199 (1st Cir. 1974).

We conclude, therefore, that for purposes of administering the current order and any further remedies that the trial judge shall order on remand, the Commissioner of Correction should be joined. See *Stock* v. *Massachusetts Hosp. School*, 392 Mass. 205, 214 (1984) (case remanded to Department of Education for joinder of further defendants for remedial purposes following determination by the Supreme Judicial Court that the department had erred in its treatment of plaintiff, a disabled student), cert. denied, 474 U.S. 844 (1985). The sheriff does not operate in a vacuum, and he has demonstrated that the Commissioner is in a position to thwart his compliance with the judge's order. See note 13, *supra*. See *DiMarzo* v. *Cahill*, *supra* (ruling that the Commissioner of Correction was a proper party defendant in an action concerning unconstitutional conditions at a county facility). See also *Benjamin* v. *Malcolm*, 803 F.2d 46 (2d Cir. 1986) (affirming order joining Governor of New York and the Commissioner of the New York State Department of Correctional Services for remedial purposes following adjudication of unconstitutional conditions in city jail and imposition of population cap); *Albro* v. *County. of Onondaga*, 627 F. Supp. 1280 (N.D.N.Y. 1986) (refusing to vacate order permitting

---

accept detainees from the sheriff under § 52A. Thus, the sheriff has demonstrated that his good-faith efforts to comply with the trial judge's order have been frustrated by the Commissioner of Correction.

joinder of New York State defendants in action in which court found unconstitutional conditions in county jail). Cf. *Libby* v. *Marshall*, 653 F. Supp. 359 (D. Mass. 1986), appeal dismissed, 833 F.2d 402 (1987). On remand to the trial judge, we order that the Commissioner of Correction be joined as a party defendant.

The trial judge's judgment concerning liability of the sheriff is affirmed, as is the judge's order. The case is remanded for consideration of such further remedies as now are needed. The Commissioner of Correction is to be joined as a party defendant.

*So ordered.*