Henry, Bruce R., J.
These two matters have been consolidated for consideration of the motion of the plaintiffs in the Richardson case for further injunctive relief and of the motion of the defendant in the Doyle *271 case seeking modification of the injunction entered in that matter in 1993. Hearings have been held on both motions and I have toured both the Middlesex County-Jail in Cambridge and the Middlesex County House of Correction in Billerica. I will review the previous court orders regarding both of these facilities, discuss the current situation at each, and make final orders for the resolution of the issues raised by these two motions. In essence, I allowboth motions, at least in part.
Richardson Order
In the Richardson matter a class of pre-trial detainees obtained injunctive relief regarding the population to be housed at the Middlesex Couniy Jail in Cambridge (the Jail). The injunction, which was affirmed in 1990, enjoined the Sheriff:
1. From allowing inmates to sleep on the floor. Every inmate shall be furnished with a bed. 2. From allowing more than one inmate to be housed in a cell. 3. From allowing inmates to be housed in or to sleep in the cells on the [ground floor] except for any purpose relating to the transportation of prisoners to and from the jail. 4. From allowing inmates to be housed on or to sleep anywhere on the 17th floor except for any purpose relating to the transportation of prisoners to and from the jail. 5. From housing inmates in any multiple occupancy cell or dormitory where there is not at least one toilet and wash bowl for each eight (8) inmates [citing 103 Code Mass.Regs. §972.03(3)]. 6. From housing inmates in any area where there is not at least one shower for each fifteen (15) inmates [citing 103 Code Mass.Regs. §972.07(2)]. 7. From housing inmates in the 18th floor day room [citing 103 Code Mass.Regs. §972.6]. 8. From housing inmates in the 20th floor day room [citing 103 Code Mass.Regs. §972.06]. 9. To reduce the total population of the jail as follows: (a) To 260 immediately, (b) To 240 within sixty days of the issuance of this order, (c) To 220 within one hundred twenty days of the issuance of this order, (d) To 200 within one hundred eighty days of the issuance of this order, (e) Transfer all inmates who may be transferred under the provisions of M.G.L.c. 276, §52A, (f) Remand those inmates with parole violations behind bail to the custody of the parole board, (g) Work with the courts and other agencies to establish a pretrial diversion program whereby prisoners will be conditionally released while awaiting trial, (h) Release eligible inmates to halfway houses.
Richardson v. Sheriff of Middlesex County, 407 Mass. 455, 458-59 (1990).
Doyle Decrees
Pursuant to the terms of Memorandum of Understanding, which was entered as a permanent injunction in 1993 and last modified in 1998, the Middlesex House of Correction at Billerica (HOC) may house a combined total population of 835 convicted inmates and pre-trial detainees. Pursuant to those orders, the maximum number of pre-trial detainees is 50. The two populations must be housed separately and the pretrial detainees may be placed only in single cells.
At the time that the injunction was last modified in 1998, the HOC could accommodate 865 inmates and detainees as follows: the Main Building, with 300 cells; Modular 1, housing 100 inmates; the Communiiy Work Program Modular, with a capacity of 100 inmates; Modular 2, housing 240 inmates; the Dormitory, limited by court order to 75 inmates; the Work Release Facility, housing 50 inmates.
Current Conditions The Jail
The available physical space at the Jail has not increased since the injunction was entered in 1989. For years now, however, the population at the Jail has consistently exceeded the cap established by that 1989 order, with the population at the Jail in some months reaching well over 400 detainees.
The current capacity of the Jail is as follows. The eighteenth floor contains four cellblocks with a total of 54 cells available for occupancy. Seven bunk beds have been placed in the corridors outside of each of the cellblocks on the eighteenth floor. The eighteenth floor cellblocks may house up to a total of 110 detainees. The “Max Unit,” which despite its name is not a maximum security unit, is on the eighteenth floor and houses up to 13 detainees. The eighteenth floor dormitory contains beds for 56 detainees currently.
The nineteenth floor contains four cellblocks with a total of 54 cells available for single occupancy. Three bunk beds are placed in each of the corridors of two of the cellblocks; six bunks are placed in the corridor of the third cellblock; and five bunk beds are in the corridor of the fourth cellblock. The nineteenth floor cellblocks may house up to 88 detainees.
The twentieth floor does not contain cellblocks, but is made up of several different areas with a total capacity of 153 detainees as currently constituted: 44 beds in the Annex, 6 beds in the Isolation/Segregation Unit, 44 beds in the Dormitory Special Management Unit, 8 beds in the Rear Unit, 30 beds in the New Man Unit, 18 beds in the Job Unit, and 3 beds in the Medical Unit.
As currently constituted, therefore, the Jail has 420 total beds. When the population has exceeded the available beds, plastic-form beds are placed on the floors with a thin mattress on top.
In several areas of the facility the toilet and shower facilities are inadequate to meet the requirements set in the 1989 orders.
The House of Correction
As of March 16, 1998, when the last order was entered in the Doyle matter, the HOC could house 865 inmates and detainees. Since then, several of the *272 buildings have been demolished and new construction has been completed. Currently, the HOC consists of the Main Budding, which has been in use since 1931, with three tiers with each tier having four sides with 25 cells per side. The Main Building tiers, therefore, have 300 individual cells. In December of 2007, the Main Budding Dormitory was opened. It can house up to 60 detainees or inmates.
The Dormitory Budding is a separate budding and is permitted to house 75 inmates, per the Doyle order. Currently, the Dormitory Building houses, primarily, inmates who participate in the Community Work Program. The Work Release Facdily in the former Sheriffs and Correctional Officers’ Residences houses up to 50 inmates.
In June of 2006 the Podular Budding was opened. The Podular Budding is composed of four pods of 64 ceds on two levels. Each pod consists of an open communal area surrounded by ceds. 62 of the ceds are double-occupancy ceds and two ceds in each pod are handicapped accessible and are single-occupancy ceds. Each pod may house 126 inmates, for a total of 504 inmates in the four pods. The Podular Budding also contains a Health Services Unit with 21 beds—8 single ceds, a larger ward with 9 beds and a smader ward of 4 beds. The Podular Budding was budt with a core facility which includes an Intake area, Kitchen/Food Services facdities, Health Services Unit, Visitation Area, and a Central Control area.
Currently, the HOC has the capacity to house 1,010 inmates and detainees.
There is a planned construction project which wid add a new pod and a dormitory budding for an additional 496 beds at the HOC. The contract for that construction has been signed, according to Deputy Superintendent McAdam. The project has a projected completion date of April 30, 2014.
Richardson Plaintiffs’ Requested Redef
The Richardson plaintiffs cad for the Court to put an immediate end to the overcrowding at the jail and to estabdsh a plan to prevent the condition from recurring. They cad for the imposition of a mechanism for the mandatory release of sufficient numbers of the population at the facdities to ensure that the caps are not exceeded. In addition, they seek an order requiring the Sheriff to estabdsh a pre-trial diversion program provided for in G.L.c. 127, §20B. Finady, they urge the Court to consider an order calling for the reduction of the inmate population at the HOC through sentence reductions and release of inmates with GPS monitoring.
Sheriffs Proposed Reduction of Jad Population
The Sheriff has called for a restrained response to the current overcrowding at the Jad. He cads for: raising the population caps at the HOC and permitting the transfer of detainees from the Jail to the HOC; reconfiguring the Jad and in creasing the cap there from 200 to 230; getting the Middlesex Superior Court and the District Courts to expedite the flow of criminal cases in the county and to consider adjustments to the “Jail Cap Sessions” currently being held.
The Sheriff has proposed reducing the Jad population by 160 detainees. His proposal cads for some of the sections of the Jad to be closed and the detainees and staff moved to the HOC. Some of the bunks would be removed from the corridors reducing the number of detainees so housed to five on each of the four sides of the two tiers. The over ad plan cads for a reduction of 160 in the Jad population. In addition, the Sheriff seeks to increase the population cap at the Jad to 230. I have an incomplete understanding of where those 230 detainees would be housed. From discussions during my visit to the Jail, it is my understanding that the Sheriff proposes to reduce the number of beds in the corridors of each tier to 5 beds, to close the Max Unit on the 18th Floor and the 20th Floor Annex, and to reduce the number of detainees in the New Man Unit to 15. If my understanding and my calculations are correct, there would then be the foflowing housing arrangement: Tiers A(18), B (19), C (18), D (19), E (18), F (19), G (18), and H (19); 18th Floor Dormitory (28); New Man Unit (15). That would total 191 detainees. The placement of the additional 39 detainees remains unclear to me at this time. I assume that the disciplinary/segregation beds in the Isolation and Segregation Unit and the Twentieth Floor Rear will remain for use for those detainees posing disciplinary problems or requiring segregation. That leave the Jobs Unit, which accommodates 18 detainees, and the Dormitory Special Management Unit, which can house 44 detainees, as the available housing for the remaining 39 detainees.
Jail Water Emergency
On or about May 27, 2013, due to a problem with the water pumps at the Jail, all detainees housed there had to be moved to other facilities. The HOC was used and some detainees were double-bunked on a temporary basis. Approximately 70 detainees were housed in facilities in other counties.
After the problem was fixed, many of the detainees were returned to the Jail. As of the hearing on June 7, 2013, 221 detainees had been returned to the Jail with another 15 due to be returned from other counties’ facilities.
Preliminary Orders
After a hearing on May 29, 2013, I issued some preliminary orders designed to alleviate the overcrowding at the Jail. The population cap at the HOC was raised to 1,010 inmates/detainees and the Sheriff was authorized to begin the process of moving detainees from the Jail to available housing at the HOC. The preliminary order called for detainees to be housed separately from the inmates at all times, with the only exception to be permitted in the Health Services Unit. *273 The order indicated that detainees maybe housed only in single cells.
I scheduled a hearing to address concerns about the impact of the increased population at the HOC on the availability of programs and services for both the inmate and the detainee populations. That hearing was held on June 7, 2013, and Superintendent McAdam responded to questions from the Court and from counsel for the Sheriff and for both groups of plaintiff.
Findings
As previously noted, the Jail has been overcrowded and the HOC has excess capacity. I find that the HOC has a capacity of 1,010 as currently configured and that the transfer of detainees to the HOC will not seriously impact the access that the inmates have to programs and services. My main concern was with the inmates’ and detainees’ access to medical and mental health services. I am satisfied that the Health Services Unit at the HOC can accommodate the influx of the detainees and that the medical and mental health services at both facilities will remain adequate to address the needs of the populations there. The medical provider has apparently raised the issue of whether the present dental services will be sufficient and that issue is being examined with the Sheriff. Overall I am satisfied that the HOC can safely accommodate the transferred detainees without adversely impacting the services and the programming which has been offered to the inmates there.
The overcrowding at the Jail is ongoing. Currently, even with the number of detainees remaining at the HOC after the recent emergency transfer, the population of the Jail exceeds the cap of 200 which was imposed years ago.
I have considered the parties’ various requests for relief. I decline to grant all of the relief requested by the parties. While the flow of cases through the Mid-dlesex Superior Courtis under continuous evaluation, I do not recommend any changes at the present time to the manner of handling criminal trials in this court. I am not convinced that a change in the current criteria used in the “Jail Cap Sessions” is warranted. If there are some specific changes in that regard that the Sheriff suggests should be considered, any such recommended changes will be reviewed with the Regional Administrative Justice for Criminal Business in Mid-dlesex County, the District Attorney, and the Probation Department.
I have reviewed the recommendations of Edward Brennan, the Special Master appointed the Richardson matter in 1995, in his report of June 23, 1995, and agree with his assessment that the Jail can accommodate an increase in the population cap to 230 detainees. As previously indicated, the final housing arrangement of the proposed 230 detainees is imprecise and the Sheriff must submit his proposed plan in writing by the close of business on June 20, 2013.
It should be understood that the increased caps on the populations at the HOC and at the Jail constitute the ceiling and not the floor on the numbers of inmates/detainees who may be housed at those facilities. I am aware that the populations may at times, as they have in the past, exceed the capacities of the Jail and the HOC and am not unsympathetic to the difficult position in which such situations put the Sheriff. The Sheriff, however, must in those circumstances take all available steps to house detainees or inmates at other county or state facilities or to make space available at the HOC through the steps which have been available in the original orders in these matters and which are repeated below. I am also aware that there may be emergency situations,[2] such as the recent water supply problem at the Jail, where a temporary relaxation of the caps may be needed. In the case of such an emergency the Sheriff may seek written authorization, as provided in the orders below, to exceed temporarily the caps at the HOC or the Jail.
ORDERS
For the foregoing reasons, it is ordered that:
1. The population cap at the Middlesex County House of Correction in Billerica (HOC) is increased to 1,010. That number is a cap and it may not be exceeded without written authorization from either the Civil Regional Administrative Justice or the Criminal Regional Administrative Justice for the Middlesex Superior Court or a designee.
2. The cap is based on the following population limits for each of the units: Main Building Tiers 1,2, and 3 (300), Main Building Dormitory (60), Podular Building (256 cells, 248 of which house two inmates for a total of 504 inmates), the Work Release Program Facility (50), the Community Work Program Dormitory (75), and the Podular Infirmary (21).
3. Any pre-trial detainees housed at the HOC must not be confined in the same room, cell, shared cell-block or corridor, or waiting area with committed inmates. The only exception to this order which is permitted is in the Health Services Unit, where inmates and detainees may need to be housed on the unit, but may not be housed in the same cell.
4. Pre-trial detainees assigned to cells on the Main Building Tiers at the HOC shall be housed in single cells.
5. No inmate or detainee may be housed in the Lower Report Area of the Main Building at the House of Correction.
6. No inmate or detainee is to sleep on the floor or on a plastic form bed on the floor. Each detainee or inmate is to have a bed.
7. Notwithstanding G.L.c. 279, §15, the Sheriff shall not accept inmates sentenced to the Middlesex HOC as a result of convictions in courts outside of Middle-sex County, except with his consent and by way of administrative transfer.
*274 8. Notwithstanding G.L.c. 127, §129D, the Sheriff retains the ability, as delineated in the 1993 Memorandum of Decision, to grant a further deduction of sentences in excess of the number of days permitted by that statute. The Sheriff is authorized to grant inmates up to a maximum of twelve days of earned good time credit per month.
9. If after all other measures have been taken and all other housing options have been exhausted the Sheriff is unable to meet the caps imposed by these orders, the Sheriff shall award certain sentenced inmates at the HOC ten days credit toward the reduction of their sentences; this award shall continue inmate by inmate, in sequence, until the population cap is achieved. If the specified cap has still not been achieved after a first round of such credits, the Sheriff shall award an additional series of five day credits in the same order until the specified cap is achieved. The credits to sentenced inmates shall not exceed two-thirds of the sentence ordered to be served by the Trial Court of the Commonwealth. In no event shall any such credits be awarded under this order to inmates sentenced to the HOC for convictions of crimes which cariy a mandatory sentence or for trafficking in Class A or Class B substances. Further, no person whom the Sheriff has determined to be a danger to a particular person or to the public shall be awarded credits pursuant to this order. Prior to the release of a sentenced inmate under this order, the Sheriff shall notify the Middlesex County District Attorney’s Victim Witness Program, the Probation Department of the sentencing court, and the arresting law enforcement department. This credit mechanism shall not apply to the day reporting component of the HOC.
10. The population cap at the Middlesex County Jail in Cambridge, Massachusetts, is increased to 230. That number is a cap and it may not be exceeded without written authorization from either the Civil Regional Administrative Justice or the Criminal Regional Administrative Justice for the Middlesex Superior Court or a designee.
11. By the close of business on June 20, 2013, the Sheriff is to submit his written proposal for the placement of the 230 detainees who will be housed at the Jail.
12. The Sheriff will have thirty days from the date of this order to achieve compliance with the new cap of 230 detainees at the Jail.
13. No detainee is to sleep on the floor or on a plastic form bed on the floor. Each detainee is to have a bed.
14. The Sheriff shall transfer all detainees who may be transferred under the provisions of G.L.c. 276, §52A.
15. The Sheriff may, in accordance with G.L.c. 127, §20B, work with the courts and other agencies to establish a pre-trial diversion program for certain detainees providing for conditional release of detainees while awaiting trial.

Periodic, or even steady, rises in the numbers of detainees or inmates may well occur and are not the emergencies that this provision is meant to address.