Cratsley, J.
Introduction
Plaintiffs initiated this action individually and on behalf of all others similarly situated at the Bristol County Jail located at Ash Street, in New Bedford (“the Ash St. Jail”), and the Bristol County House of Correction located in North Dartmouth (“the House of Correction”).[4] The plaintiffs challenge the severely overcrowded conditions of both facilities which, they argue, violate their constitutional rights. They seek a preliminary injunction, pursuant to Mass.R.Civ.P. 65(c), against the defendants to enjoin them from continuing the practice of various departmental policies. In addition, plaintiffs request the appointment of a Special Master to perform the statutory obligations that the Commissioner of Correction allegedly is neglecting or refusing to perform. On September 11, 1998, the court took a view of the two facilities. For the following reasons, the court Grants in part and Denies in part the plaintiffs’ motion for injunctive relief.
Background
Plaintiffs are all adult individuals currently incarcerated at either the Ash St. Jail or the House of Correction. Defendant Thomas Hodgson is the Sheriff of Bristol County and thus statutorily responsible for all of Bristol County prisoners.
*165 The Ash St. Jail was built in 1828. It comprises two wings of cells, with four tiers each, for a total of 200 cells, 30 of which are used for the regional lockup. Only a percentage of these cells are currently being used because a high number of them are in a state of disrepair. In addition, a number of cells have been permanently diverted for other uses, such as to install more showers and for attorney interview rooms. Other parts of the facility are used for administrative segregation, health services, day room areas, a kitchen, and an intake area. There is a secure yard for outdoor recreation. There is also a gymnasium which needs substantial roof and floor repairs and is no longer in use. A portion of the facility, which included day room areas, was burned down by inmates during a riot in 1993. The population fluctuates on a daily basis. On September 11, 1998, the jail held approximately 205 inmates.
The House of Correction has 309 cells. On September 11, 1998, the House of Correction was housing 698 inmates. The House of Correction is divided into 12 units comprising of the following: EA-Female Maximum; EB-Female Minimum; EC-Special Offenders (male); ED-Maximum (male); EE-Segregation; FA-Pretrial maximum; FB-Pretrial Minimum; GA and GB-Sentenced Minimum; RA and BB-Sentenced Medium. Except for units EA and EB, all of the other units house only male inmates. Each of the units at the House of Correction are self contained with its own dining area, recreational area, and shower facility. Most of the units in the facility are triple bunked.
The conditions at the two facilities violate Department of Public Health (“DPH”) regulations. See 105 Code Mass. Regs. §451.000: Minimum Health and Sanitation Standards and Inspection Procedures for Correctional Facilities. For example, in a letter dated February 6, 1998 from the Director of DPH to the Sheriff it was stated that during their semiannual inspection of the Ash St. Jail the inspectors noted further deterioration of the facility, and that the age and lack of ongoing maintenance has created a situation where continued occupancy must be seriously considered.
The plaintiffs seek an Order from this Court enjoining the Sheriff from (1) forcing persons placed in his custody, including pregnant women, to sleep on mattresses or hard plastic shells placed on the floor; (2) confining for more than ten hours per day, any person in a cell where there is less than 35 square feet of unencumbered floor space for each person housed in that cell; (3) housing any person that he is not statutorily required to house, including those persons arrested by a local police department or those persons taken into custody by a local police department as a result of G.L.c. 11 IB, §8, until the Bristol County Correctional facilities are no longer overcrowded; (4) housing any person at the Ash St. Jail until it fully complies with the State Fire Code; and (5) implementing the inmates’ medical co-pay policy.
The defendants concede that the facilities are overcrowded. They contend, however, that the Sheriff is completing a modular unit, annexed to the House of Correction, which will accommodate 300 beds. They maintain that the completion of the modular unit will alleviate the overcrowding problem that exists at the House of Correction. The modular unit is expected to open around mid-October of this year.
Discussion
In determining whether to grant a preliminary injunction, this court considers the balancing test set forth in Packaging Industries Group, Inc. v. Cheney, 380 Mass. 609, 616-17 (1980). See also Planned Parenthood League of Massachusetts, Inc. v. Operation Rescue, 406 Mass. 701, 710 (1990). First, the court must evaluate, in combination, “the moving party’s claim of injury and its chance of success on the merits.” Id. at 617. If failing to issue the injunction “would subject the moving party to a substantial risk of irreparable harm, this court must then balance this risk against any similar risk of irreparable harm which granting the injunction would create for the opposing party." Id. “In the context of a preliminary injunction, the only rights which may be irreparably lost are those not capable of vindication by a final judgment, rendered either at law or in equity.” Id. at 617 n. 11.
Moreover, in appropriate cases the court should also consider the risk of harm to the public interest. GTE Products Corp. v. Stewart, 414 Mass. 721, 723 (1993); Biotti v. Board of Selectmen of Manchester, 25 Mass.App.Ct. 637, 640 (1988). Finally, a preliminary injunction is a drastic remedy that a court should not grant unless the movant, by a clear showing, carries its burden of persuasion. Charles Wright & Arthur Miller, 11 Federal Practice & Procedure, §2948, at 129-30 (.1995).
I. Plaintiffs’ request to enjoin the Sheriff from forcing persons placed in his custody, including pregnant women, to sleep on mattresses or hard plastic shells placed on the floor[5]
In the House of Correction, there are two units, EA and EB, designated to hold female inmates. Unit EA holds inmates classified as maximum and Unit EB holds minimum security inmates. There are 8 cells in Unit EA, of which 7 were triple bunked on September 11, 1998. There are 16 cells in Unit EB, of which 14 were triple bunked on September 11, 1998. On September 11, 1998, the day of the court’s visit, Unit EA held 23 inmates, and Unit EB housed 46 inmates, resulting in many female inmates sleeping on mattresses on the floor in the cell. On certain days, an increase in the number of female inmates can result in several of them sleeping on ‘boats’[6] in the common area of the units. Both units contain pretrial detainees *166 classified as either minimum or maximum, depending on the nature of the crime for which they were arrested, This practice results in the intermingling of pretrial detainees and convicted female inmates subjecting them to the same conditions of confinement. The defendants conceded that due to the overcrowding condition of the facility, cells are assigned to inmates on a first come, first serve basis.
On June 11, 1998, the Sheriff applied for a waiver of 103 Code Mass. Regs. §942.03(3) — separate housing for inmates awaiting trial. In a letter dated July 7, 1998, the Commissioner asked for more information regarding that waiver request. There is nothing in the record to indicate the current status of the Sheriffs request for waiver of §942.03(3). The grant or denial of the request for waiver will not affect this Court’s decision.
Massachusetts courts have differentiated between the conditions of confinement for pretrial detainees and convicted prisoners. “Unlike pretrial detainees who may not be punished at all, convicted prisoners may be punished as long as the punishment is not cruel and unusual under the Eighth Amendment. ” Abdullah v. Secretary of Public Safety, 42 Mass.App.Ct. 38 7, 393 (1995), and cases cited. In the case at bar, however, it is undisputed that pretrial detainees and convicted prisoners are intermingled and thus subjected to the same degree of punishment.
The Richardson case discusses what conditions of confinement constitute either punishment or cruel and unusual punishment in violation of article 26 of the Massachusetts Declaration of Rights. Richardson v. Sheriff of Middlesex County, 407 Mass. 455, 462 (1990) (“use even of floor mattresses constitutes punishment without regard to the number of days for which a prisoner is so confined”). Furthermore, the “failure to provide an inmate with a toilet that can be flushed from within the inmate’s cell constitutes cruel and unusual punishment in violation of the Eighth Amendment”; “plainly insufficient or inadequate toilet and shower facilities also constitute punishment.” Id. at 463. See also Lareau v. Manson, 651 F.2d 96,105 (2d Cir. 1981), where the court ruled improper the double-bunking of inmates in cells of sixty or sixty-five square feet, particularly because the common and recreational areas of the facility were also extremely crowded.
Because the plaintiffs have shown a likelihood of success on the merits of this claim, and the balancing of the harm to the parties favors granting the plaintiffs injunctive relief under these factual circumstances, this Court hereby enjoins the Sheriff from continuing the use of port-a-bunks in the House of Correction. This Court also enjoins the Sheriff from allowing inmates to sleep in the common area of the House of Correction. And this Court further enjoins the Sheriff from triple bunking any cell in the House of Correction or otherwise forcing inmates to sleep on the floor of their cells. This preliminary injunction is effective as of November 16, 1998 because by then the modular unit would have opened thus freeing more cells for the expansion of the female units.
II. Plaintiffs’ request to enjoin the Sheriff from confining for more than ten hours per day, any person in a cell where there is less than 35 square feet of unencumbered floor space for each person housed in that cell[7]
As of late February 1998, the Sheriff implemented a security risk rating system which places the inmates under three security levels — minimum, medium, and maximum. Most of the inmates at the Ash St. Jail are classified as maximum security inmates and are confined to their cells for approximately 23 hours a day. All the cells that are currently in use at the Ash St. facility were designed for single cell occupancy,[8] but are double bunked as a result of the number of cells not in use because they are in a state of disrepair, and because of the increasingly overcrowded situation at the facility.
In a letter dated March 18, 1998, the Commissioner acknowledged that there was an overcrowding issue at the North Dartmouth facility, and granted the Sheriff a waiver of 103 Code Mass. Regs. §920.06 — Cell Design and General Housing Area Requirements (waiver as to unencumbered space only). The waiver is effective through March 18, 1999. The Sheriff, then, argues that this unencumbered space requirement issue should not be before the Court because he obtained a waiver from the Commissioner. The plaintiffs argue that the Court should appoint a Special Master to seek compliance with the regulations since trie current Commissioner is not willing to enforce the regulations.[9]
There is merit to plaintiffs’ contention that confining inmates in a small cell over a substantial period of time amount to unconstitutional punishment. Campbell v. Cauthron, 623 F.2d 503, 505-06 (8th Cir. 1980) (detainees held in closely crowded multiple-occupancy cells were unconstitutionally punished); French v. Owens, 777 F.2d 1250, 1253 (7th Cir. 1985), cert. denied, 479 U.S. 817 (1986) (where double-celling resulted in only twenty-four square feet of space per inmate, it was a violation of the Eighth Amendment rights of the prisoners). Similarly, in Toussaint v. Yockey, 722 F.2d 1490 (9th Cir. 1984), the court upheld a preliminary injunction forbidding double-bunking in cells of less than fifty square feet. See also Inmates of the Suffolk County Jail v. Kearney, 734 F.Supp. 561 (D.Mass. 1990) (refusing to modify a consent decree to permit double-bunking in cells of approximately seventy square feet).
This Court will not impinge upon the discretion of the Sheriff to classify the inmates in order to ensure the orderly operation and management of the institution. However, since under this classification method and the prison’s policy, the inmates spend a considerable amount of time confined to their tiny and ancient cells, in likely violation of their constitutional rights, this Court is ordering that the Sheriff house only one inmate per cell at the Ash St. Jail. As previously noted, the' *167 Sheriff is further enjoined from triple bunking inmates in the House of Correction, and to cease the use of floor mattresses and port-a-bunks in the units. This in-junction shall take effect on November 16, 1998, after the Sheriff has a full and fair opportunity to open and properly manage the modular emit at the House of Correction. The Sheriff may also use this time to promptly repair the many unused cells at the Ash St. Jail which were seen on the September 11th view.
III.Plaintiffs’ request to enjoin the Sheriff from housing any person that he is not statutorily required to house, including those persons arrested by a local police department or those persons taken into custody by a local police department as a result of G.L.c. 11 IB, §8, until the Bristol County Correctional facilities are no longer overcrowded
This Court is not willing at this point to enjoin the Sheriff from housing local arrestees because it is within the discretion of the Sheriff to do so. See G.L.c. 126, §4 (“Jails may be used for the detention of persons arrested without a warrant and not admitted to bail . . .’’) However, the Sheriff is hereby enjoined from automatically reserving the 30 cells for regional arrestees. This Court notes the affidavits submitted by the Chief of Police of the City of New Bedford as well as the Chiefs of Police of the Towns of Acushnet and Fairhaven. The Court appreciates their dilemma in not having an adequately equipped lock-up in their respective police departments for the temporary confinement of local arrestees. This Court cannot, however, tolerate, under these overcrowded circumstances, the Sheriffs continued practice of reserving 30 cells for the possible overnight/weekend detention of local arrestees. This is particularly true when the overcrowding at the Ash St. jail results in the likely violation of the constitutional rights of the people confined there for far longer periods of time than overnight. The balance of harm favors the inmates in light of the likely violation of their constitutional rights.
The defendants argue that the public interest involved in the Sheriffs agreement to house the local arrestees outweighs any harm that results to the plaintiffs. This Court disagrees because there are alternatives available to the City of New Bedford and the other towns. At the preliminary injunction hearing, it was argued that the police departments involved can detain the arrestees in their own police departments. In addition, the various departments could seek funds to renovate their own lockups. It is therefore ordered that the Sheriff, his employees, and his agents are enjoined from automatically reserving cells for the possible detention of local arrestees. After November 16, 1998, all available cells shall be regularly assigned, one inmate to a cell, to the already arraigned, pretrial detainees usually housed at the Ash St. Jail. In the event that additional cells become available, after the close of the court day, due to the restoration of the currently unused cells or otherwise, the Sheriff may, in his discretion, and subject to this order, agree to house local arrestees overnight on a case by case basis.
IV. Plaintiffs’request to enjoin the Sheriff from housing any person at the Ash St. Jail until it fully complies with the State Fire Code
It is undisputed that the jail does not comply with the State Fire Codes. This Court will not order the closing of the jail, however, because of the public interest involved. See Michaud v. Sheriff of Essex County, 390 Mass. 523, 534-35 (1983) (closing a jail involves consideration of the public interest as well as the constitutional rights, of the prisoners). The Sheriff recently secured funds from the state Executive Office of Public Safety for the installment of two additional fire exits, one from each bank of cells. According to the defendants, one-exit will be completed by mid-November of this year, and the second one by mid-December. Under these circumstances, failing to issue the injunction requested will not subject the plaintiffs to irreparable harm. In light of the public interest of maintaining a safe place for the confinement of those who are accused of breaking the law and pose a risk of flight prior to trial, and the steps taken by the Sheriff to upgrade the jail’s safeiy, the Court denies the plaintiffs’ injunctive relief on this claim.[10]
V. Plaintiffs request to enjoin the Sheriff from implementing the inmates’ co-pay policy
Section 932.08 of 103 Code Mass. Regs, provides that “written policy and procedure [of the Department] shall provide for unimpeded access to health care . . .’’In addition, G.L.c. 126, §29, imposes the expense of keeping and maintaining inmates on the county where the inmates are incarcerated. The plaintiffs argue that the Sheriff has no authority to implement the co-pay policy, and that the policy violates the statute and the regulations. They further argue that the policy poses a serious health hazard both inside and outside the Ash St. Jail and the House of Corrections in North Dartmouth. They also argue that the Sheriffs policy discourages inmates from seeking medical care because they do not wish to use their canteen money, thereby endangering the health of all persons in the Bristol County correctional facilities. This Court is not persuaded by the plaintiffs’ argument, however, for the following reasons.
The Department’s written policy, which is provided to inmates in both English and in Spanish, requires inmates to make a co-payment for certain health care services. Under the policy, inmates are required to pay $3 to $5 for certain health care services. The stated purpose of such a fee is to promote responsibility and accountability in the inmates’ use of medical services, and the management of their personal health, in addition to preparing the inmates for their future adjustment to life in the community. The policy also provides that certain services are exempt from the co-pay requirement. These services include:
*168 a) admission health screening
b) 14 day health assessments (physical)
c) Emergency care/trauma care
d) Hospitalization/infirmary care
e) prenatal care
f) lab and diagnostic services
g) follow-up visits
h) contagious disease care
i) chronic care/specialty care
j) mental health services
k) drug abuse and addiction.
Under the policy, no inmate is denied access to medical care because of an inability to make the required co-payment. Rather, the charge will be assessed against the inmate’s canteen account after health care services are rendered. Therefore, the Sheriff is still providing health care services to the inmates regardless of whether they are immediately able to pay. In addition, the plaintiffs can point to no legal authority that holds that the Sheriff has to provide absolutely free health care. On the contrary, although our Supreme Judicial Court has not yet addressed the issue, case law on inmates’ co-pay indicates that the Sheriffs power to impose such co-pay is incidental to his power to manage the prisons. See Reynolds v. Wagner, 128 F.3d 166, 175 (3rd Cir. 1997) (prisoners are not guaranteed the right to be entirely free from the cost considerations that figure in the medical-care decisions made by most nonprisoners in our society): Douglas v. DeBruyn, 936 F.Supp. 572 (S.D. Indiana 1996) (upholding a policy requiring inmates to purchase medication unless in an emergency situation). See also City of Revere v. Massachusetts General Hospital, 463 U.S. 239, 245 n.7 (1983) (holding that a governmental entity had the right to recover from a detainee the cost of the medical services provided to him). Based on existing case law, the plaintiffs have not demonstrated a likelihood of success on this claim.
VI. Plaintiffs’ request for the appointment of a Special Master
The Sheriff recently received $429,129 for the renovation of the Ash St. Jail. He is about to open a new modular unit at the House of Correction. The Sheriff has made several representations to this Court regarding various projects intended to ameliorate the overcrowded conditions at both facilities. It is premature at this point to appoint a Special Master when these projects are imminent. This Court has set a time table for the completion and implementation of these projects and believes that these promised steps suffice for now. Thus this Court denies, without prejudice, plaintiffs’ request for the appointment of a Special Master to oversee the Sheriff.
ORDER
It is therefore ORDERED that a preliminary injunction issue, restraining the defendants, their agents and employees from the following:
1. There shall be no more triple bunking at the House of Correction in North Dartmouth after November 16, 1998. A cap of two (2) inmates per cell is required in all the units. Floor mattresses and “boats” shall no longer be used in this facility.
2. Inmates shall no longer be required to sleep in any common area of the House of Correction in North Dartmouth.
3. The Ash St. Jail shall be reduced to single cell occupancy by November 16, 1998.
4. The Sheriff shall cease the practice of reserving 30 cells for the detention of local arrestees after November 16, 1998. All available cells at the Ash St. Jail, including those which can be renovated, shall be used, one inmate to a cell, for the detention of already arraigned, pretrial detainees. In the event that additional cells become available, after the needs and requirements of the courts are met, the Sheriff, in his discretion, may agree to house local arrestees on a case by case basis.
This Court will hold a status hearing on Friday, December 4, 1998, at 2:00 p.m., to review compliance with this preliminary injunction.

Plaintiffs’ motion for class certification, filed with this Court on June 16, 1998, has not yet been argued. The defendants have not to date filed an opposition to plaintiffs’ motion.

This request for injunctive relief affects only the House of Correction because there are no women confined at the Ash St. Jail, except for the temporary detention of female regionals.

The “boats," also called "stack-a-bunks” or “port-a-beds,” are individual molded plastic shells measuring approximately 6 feet long and 21/2 feet wide.

This is a problem that is more predominant at the Ash St. Jail because the inmates are confined to their cells for a longer period of time at Ash St. than at the House of Correction.

The cells measure 48 square feet in area. Each cell contains (1) a bunk bed measuring approximately 6 feet, 11 inches long by 2 feet, 10 inches across, (2) an open toilet measuring 16 inches from the wall to the outer edge of the bowl, (3) a sink measuring 12 inches from the wall to the outer edge of the bowl, (4) two metal storage bins for inmate property, stored under the bottom bunk, and (5) one bare-bulb light, mounted over the window at the foot of the top bunk.

The Court addresses plaintiffs’ request for the appointment of a Special Master below.

The plaintiffs also argue that the facility does not meet fire safely codes because they fail to use automatic door locks. Although the regulations recommend the use of such devices, they are not required. This Court will not order the Sheriff to install automatic door locks because the current use of manual door locks does not rise to the level of likely violation of the prisoners’ constitutional rights.