EDWARD AHEARN & others[1] vs. GEORGE VOSE & others.[2]

No. 04-P-262.

Suffolk. January 11, 2005. - September 2, 2005.

Present: GELINAS, DOERFER, & KAFKER, JJ.

*Civil Rights,* Immunity of public official. *Governmental Immunity. Constitutional Law,* Cruel and unusual punishment.

In a class action brought by inmates of a correctional facility seeking monetary damages pursuant to 42 U.S.C. § 1983, because of the failure to provide flush toilets in the prison cells and the use instead of unsanitary chemical "Pak-A-Potties" and utility or "slop" sinks, the judge erred in granting summary judgment based on qualified immunity in favor of one of the superintendent defendants, where the facts as alleged made out a triable issue of fact regarding the existence of a constitutional violation (specifically, of the prohibition against cruel and unusual punishment contained in the Eighth Amendment to the United States Constitution) [413-418] of a clearly established right [418-420], and where there was a genuine issue of material fact whether a reasonable public officer, situated similarly to that defendant, would have understood that his conduct violated clearly established law [420-421].

CIVIL ACTION commenced in the Superior Court Department on August 7, 1990.

The case was heard by *Ralph D. Gants,* J., on motions for summary judgment.

[1]Ronald Bunker, Joseph Carpenito, Joseph Flynn, Phillip Landry, and Kevin Philbrook, on behalf of themselves and all others similarly situated. See note 8, *infra.*

[2]Ronald Amaral, Timothy Hall, and Thomas Rapone. Ronald Amaral served as superintendent of the Southeastern Correctional Center (SECC) from October, 1978, to November, 1989 (his affidavit and the lower court finding state this end date; however, the plaintiffs contend that he retired in October, 1990, the date also supplied in the defendants' answer); Timothy Hall served as SECC superintendent from October, 1990, to December, 1993; George Vose served as Commissioner of Correction from July, 1989, to January, 1991; Thomas Rapone served as Commissioner of Correction from February, 1991, to June, 1991. The four parties were originally sued individually and in their official capacities. Only the claims against these defendants for money damages remain; consequently, at this juncture they are sued only in their individual capacities.

*James R. Pingeon* for the plaintiffs.

*Michael C. Donahue*, Special Assistant Attorney General, for the defendants.

KAFKER, J. The plaintiffs, inmates at the Southeastern Correctional Center (SECC), are pursuing 42 U.S.C. § 1983 claims seeking monetary damages against two superintendents of the SECC and two Commissioners of the Massachusetts Department of Correction (DOC)[3] because of the failure to provide flush toilets in the prison cells and the use instead of unsanitary chemical "Pak-A-Potties" and utility sinks. A Superior Court judge allowed the defendants' motion for summary judgment on the ground of qualified immunity.

*Background.* A. *Facts.* The facts, when viewed in the light most favorable to the plaintiffs, establish that they lived in single-occupancy cells that were not equipped with flush toilets or sinks with running water until 1996. Instead, they urinated and defecated into portable chemical toilets, called "Pak-A-Potties," and used open pitchers of water for drinking and washing. To reduce the odor and break up the solid waste, a deodorizing chemical solution was used in conjunction with the portable toilets.

The package containing the solution had the following cautionary language: "Contains Methyl Alcohol and Formaldehyde. Cannot be made non-poisonous. Avoid contact with skin, eyes, or mucous membranes. Avoid prolonged or repeated breathing of vapor. Prolonged or repeated contact may cause allergic irritation. FIRST AID: In case of skin or eye contact, immediately flush affected area with plenty of fresh water for at least 15 minutes."

The inmates kept these toilets in their cells — usually underneath or near their beds — for long periods during the day and overnight. Some prisoners in "room detention" were locked in their cells for at least twenty-three hours per day and were required to eat their meals in close proximity to their chemical toilets.

Once each day in the morning, the inmates were allowed to

---

[3]This appeal is from a judgment entered after the allowance of the defendants' renewed second motion for summary judgment.

empty the contents of their chemical toilets into utility sinks known as a "slop sinks" at the end of each cellblock. The slop sinks had drains about two and one-half inches in diameter and water taps that flushed waste down the drains. Because the sinks were not designed for sewage disposal, however, the drains frequently became clogged, causing waste to overflow and spill onto the floor. Inmates were often splashed with waste and chemicals as they dumped out the Pak-A-Potties. Many of the inmates were also required to use bathroom sinks in the same rooms as the slop sinks to brush their teeth and wash their faces.

Additionally, the plaintiffs alleged that SECC allowed the chemical toilets to fall into disrepair, with cracks and worn parts causing their contents to leak into the wooden floors and their odors to permeate the plaintiffs' living spaces. According to the plaintiffs' affidavits, inmates made repeated requests to obtain replacement portable toilets, sometimes to no avail. The plaintiffs also attested that there were often no brushes or other cleaning materials available in the slop sink areas, and that the brushes supplied were inadequate. In addition, they claimed that when an inmate was transferred out of his cell, the next occupant inherited the Pak-A-Potti, and the record includes complaints that the transferred chemical toilets could be filthy and contain another person's waste.

In a 1982 study of the sanitary conditions at SECC, Dr. Bailus Walker, who would serve as the Commissioner of Public Health from 1983 to 1987, detailed the health risks posed by the use of chemical toilets. During the process of emptying the chemical toilets in the slop sink,

> "fecal-urine aerosols are produced . . . [that] harbor both bacteria and viruses which fallout and contaminate bedding, clothing, and other surfaces. Here the risk of infection is increased since hand contact with contaminated surfaces can result in self-inoculation by touching the nose or mouth. . . . Aside from coughing and sneezing, the emptying of these toilets must be one of the more common processes involved in the generation of infectious aerosols in the institution. Running water in the utility sink simultaneously with the discharge of feces and urine from

the portable toilet is not sufficient to prevent the build up of infectious organisms in the sink and in the cell block."

The plaintiffs claimed that the "disgusting" and "unbearable" odor of human waste and toxic chemicals emanating from the Pak-A-Potties caused nausea, dizziness, loss of appetite, headaches, and irritation of the eyes and skin. Inmates with weakened immune systems due to human immunodeficiency virus (HIV) described their particular vulnerability to the unsanitary conditions. The inmates also claimed to have made numerous complaints about the unsanitary conditions created by the use of chemical toilets, including that slop sinks backed up through floor drains in the inmates' showers.

The defendants did not dispute that the prisoners had to use the chemical toilets and slop sinks to dispose of their waste; however, they claimed that they maintained clean and acceptable conditions at SECC.[4] Defendant Vose stated that the prison "replace[d] damaged units immediately once an inmate reported the damage." According to Amaral, the SECC replaced one-third of the Pak-A-Potties per year and had sufficient supplies of disinfectant materials for the toilets. He also stated that "if an inmate reported a broken toilet ('Potti'), our facility would give him a new one right away out of the storage room." Defendant Hall recalled "personally receiving few, if any, complaints about individual toilets."[5] The defendants also contended that the prisoners abused and misused the toilets, causing them to break.

The defendants argued that the Massachusetts prison system experienced such severe overcrowding during the late 1980's and early 1990's that the "[t]ransfer of the SECC inmate population, either permanently or temporarily, . . . was not an option." The defendants further claimed that they had no control over the limited capital funds needed to install modern plumb-

---

[4]Defendant Amaral pointed out an October 20, 1989, letter from Howard Wensley, director of the division of community sanitation, that "substantial compliance has been accomplished." Likewise, defendant Hall received a similar letter on January 27, 1992: "[D]espite the age of the facility and lack of modern plumbing it is generally being maintained in a sanitary condition."

[5]Defendant Amaral did not recall any inmates complaining to him personally about the chemical toilets.

ing at SECC. Commissioners Vose and Rapone received their capital funds from the division of capital planning and operations (DCPO), an executive agency that was statutorily responsible for approving and overseeing all phases of study, design, and construction of public buildings.[6] In fiscal year 1986, DOC sought a study of toilet installation at SECC, but the request was rejected. DOC requested a study again the following year, and it was approved. Because the study estimated the project would cost close to $6 million, DCPO did not approve it due to budgetary and logistical problems. In fiscal year 1990, DCPO rejected another DOC request for project funding.

B. *Case law history.* In 1983, the Supreme Judicial Court held that the "human waste disposal system and related sanitary conditions" at the Essex County house of correction and Lawrence jail constituted cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution and art. 26 of the Massachusetts Declaration of Rights. *Michaud* v. *Sheriff of Essex County*, 390 Mass. 523, 524 (1983) (*Michaud*). Like the plaintiffs in this case, the inmates in *Michaud* had no modern plumbing; instead, two inmates each shared five-gallon buckets, which they emptied into utility sinks. *Id.* at 524-525. The court looked to the Department of Public Health regulations[7] "as an objective standard for

---

[6]SECC superintendents Amaral and Hall were not involved in requesting DCPO capital funds. They also played no part in allocating DOC funds or managing the number of prisoners at various facilities.

[7]In 1979, the Department of Public Health promulgated the "Minimum Health and Sanitation Standards and Inspection Procedures for Correctional Facilities and Detention Centers." 105 Code Mass. Regs. §§ 450.000 (1979), reprinted in 105 Code Mass. Regs. §§ 451.000 (1999). It set forth the following requirement:

"Each cell within which an individual may be locked for any part of a 24-hour day shall have a working toilet and working handwash sink with hot and cold running water. Each toilet bowl shall be raised off the floor of the inmate's cell and shall be capable of being flushed from the interior of the cell."

105 Code Mass. Regs. § 451.113 (1999). The 1979 regulations further provided:

"An existing facility which does not comply with this requirement may install chemical toilets and provide sanitary water for drinking and handwashing, *but shall comply fully within two (2) years from the effective date of these regulations*" (emphasis supplied).

assessing whether sanitary conditions at the jail fall below minimum standards of decency." *Id.* at 531. In concluding that the sanitary conditions fell below the constitutionally permissible minimum, the court issued an order to the defendants for remedial measures: "[I]n no event is a cell at the jail to be occupied beyond June 1, 1984, without the necessary renovations: the installation of a flush toilet and sink with hot and cold running water, controls for all of which are accessible from within the cell." *Id.* at 536. The court authorized "interim ameliorative measures," however, which included the use of the type of chemical toilets at issue in this case. *Ibid.* See *Richardson* v. *Sheriff of Middlesex County*, 407 Mass. 455, 463 (1990) (inmates' detention in areas lacking bathrooms and areas in which there were not enough toilets and showers violated their constitutional rights).

C. *Procedural history.* The plaintiffs in this case (Ahearn) filed their initial complaint on August 7, 1990, and later amended it on February 11, 1991.[8] At this time, ten other inmates, including William Langton, were pursuing separate litigation raising similar constitutional claims regarding the sanitary conditions at SECC. Langton v. Fair, Superior Court, No. 86-24234 (May 20, 1991). Two of the defendants in the Langton decision, Amaral and Vose, are defendants in the instant case. In Langton vs. Fair, *supra*, a Superior Court judge found that "the overall SECC toilet conditions . . . do not amount to cruel or unusual punishment." In addition, the Superior Court judge concluded that the doctrine of qualified immunity precluded liability of individual defendants for money damages

---

105 Code Mass. Regs. § 450.113 (1979). The two-year grace period ended on July 1, 1981. There is no provision for a similar grace period in the subsequent regulations.

[8]On March 21, 1991, a Superior Court judge certified a class of "all persons who are now, or may be at some time in the future, incarcerated at SECC in a cell without a flush toilet or sink with running hot and cold water." The defendants' motion to decertify the plaintiff class as to the issue of damages, however, was granted on April 9, 1999, by a different Superior Court judge. Subsequently, the parties stipulated, and the court agreed, that the precise date of decertification would be the first day of trial. The judge approved the notice to the plaintiff class on May 10, 1999, which was then mailed to all persons imprisoned in a cell without a flush toilet at SECC on or after August 7, 1990. As of June 26, 2003, 1,945 individuals had responded to the notice.

because "a reasonable person in the defendants' positions could not be expected to know that the particular conditions at SECC violated clearly established standards on unconstitutional cruel or unusual punishment." In addressing the constitutional claims, the Superior Court judge in the Langton decision considered it important that "the prisoners are required to be in their cells only for nine and a half hours at night and that they are not required to eat their meals in their cells." The judge also emphasized that the chemical toilets and slop sinks that he personally viewed on March 12 and March 14 of 1991 were sanitary and in good working condition. Nonetheless, on May 16, 1991, he issued an order designed to assure they remained in such condition. He ordered twice monthly inspections of the toilets, regular reporting on the conditions of the toilets, and assignment of a responsible staff person to oversee the condition of the toilets. The order further provided that the "Superintendent of [SECC], with the cooperation of the Commissioner of Correction, will have primary responsibility for compliance."

According to an affidavit submitted by Superintendent Hall on August 15, 1991, he instructed his staff that "all slop sink areas . . . [and] toilet areas and shower areas shall be maintained at the same high level of cleanliness and maintenance as was observed by the court in March 1991."[9] The Langton decision also prompted a DOC attorney to advise officials and inmates, in a letter dated January 27, 1993, that "[u]tilization of portable toilets at SECC has been litigated and has passed judicial scrutiny."

On November 8, 1993, the plaintiffs in this case moved for summary judgment and, in the alternative, for a preliminary injunction that would prevent the defendants from placing them in cells at SECC without modern plumbing. The defendants filed a cross motion to dismiss on the same day, claiming that res judicata barred the action because of the Langton decision. Both motions were denied on January 6, 1994, without a written decision.

The plaintiffs in this case filed a petition pursuant to G. L. c. 231, § 118, seeking to appeal from the interlocutory decision.

---

[9]He also ordered that detergent and long-handled brushes would be present in the slop sink areas.

A single justice granted leave to file the appeal, which was then consolidated with the appeal of the plaintiffs in the Langton decision from the dismissal of their claims and the denial of monetary damages regarding toilet facilities. After oral argument before this court, the plaintiffs in this case reached a settlement with the defendants that ensured the installation of permanent toilet and shower facilities at SECC under a single justice's supervision. In an unpublished memorandum and order entered pursuant to Appeals Court Rule 1:28, as amended, 10 Mass. App. Ct. 942 (1980), this court observed that the settlement "render[ed] moot that portion of the injunctive relief sought by the plaintiffs concerning toilet and shower facilities." *Langton* v. *Commissioner of Correction*, 38 Mass. App. Ct. 1130 (1995) (denominated as Langton *vs.* Fair in the Superior Court). Because of the settlement in this case, however, the court determined that the "two cases will be resolved separately." In the same memorandum and order, this court affirmed the Langton decision for substantially the reasons stated by the trial judge, which reasons included the judge's findings that the conditions at the SECC in 1991 were not unconstitutional. This court specifically observed that "[t]he Superior Court judge correctly ruled that the defendants are entitled to qualified immunity as public officials." *Langton* v. *Commissioner of Correction, supra.*

After new toilet facilities were installed at SECC in November, 1996, the defendants in this case moved for summary judgment on the plaintiffs' remaining money damage claims, asserting that the defendants — like those in the Langton decision — were entitled to qualified immunity. On February 10, 1999, a Superior Court judge granted summary judgment as to all claims except the plaintiffs' claims under 42 U.S.C. § 1983. He determined that the allegations concerning the "bestial" conditions of the toilets and slop sinks were sufficient to defeat the defendants' motion for summary judgment. On the defendants' second motion for summary judgment (essentially seeking reconsideration), the same judge acknowledged that the defendants' reply brief — which had not reached him before he issued his decision — "raise[d] some issues which the trial judge may wish to address prior to trial in order to

delineate the issues which should be tried." He referenced the defendants' arguments that improper maintenance and operation of the toilets may not have been fairly raised by the original and amended complaints and invited the trial judge to consider the issue, but denied the defendants' motion. He also raised the issue whether the record established claims against all the defendants.

Although precise dates are lacking, the plaintiffs have submitted affidavits from thirteen sample prisoners describing conditions at SECC from 1984 to 1998, including the time periods when the various defendants were in office. Only the affidavit of Ronald Bunker, however, appears to relate to the time period covering Amaral's service.[10]

Subsequently, on June 26, 2003, on the defendants' renewed second motion for summary judgment and the plaintiffs' cross motion for partial summary judgment, another Superior Court judge granted the defendants' motion and denied the plaintiffs' motion as moot.[11] The judge did not address whether there was a constitutional violation. Instead, the judge, relying on the Langton decision and its affirmance by this court, ruled that the defendants were protected from liability by the doctrine of qualified immunity. He did so while scrupulously pointing out the factual differences between the findings in the Langton decision and the factual averments here. He also determined that the "focus of the litigation . . . was on the failure to install conventional flush toilets, not the maintenance of the chemical toilets," and therefore a claim based on the latter and not the former was precluded. He added: "Nor, pragmatically, does it make any sense for the Court to devote the extraordinary amount of time it would take to determine at trial whether the chemical toilets and slop sinks of the 1,945 members of the plaintiff class were properly maintained in order to resolve this case." It is from this decision and subsequent judgment that the plaintiffs appeal.

---

[10]Bunker's affidavit pertains to separate imprisonments both during and after Amaral's service. The affidavit alleges that only during Bunker's second period of incarceration at SECC from 1993 to 1998 did Bunker have a portable toilet of the type at issue here; hence his complaints about the portable toilets do not pertain to a time when Amaral was at SECC.

[11]We agree that the plaintiffs' cross motion, to the extent it sought an order for declaratory or injunctive relief, is moot as the flush toilets were installed in 1996, and the SECC is now closed. See *Masonoff* v. *DuBois*, 336 F. Supp. 2d 54, 56 (2004).

D. *The* Masonoff *litigation.* In 1994, other SECC inmates filed an action in the United States District Court for the District of Massachusetts seeking declaratory and injunctive relief and monetary damages. *Masonoff* v. *DuBois*, 899 F. Supp. 782 (D. Mass. 1995) (*Masonoff I*). A class was certified for the purposes of declaratory and injunctive relief, but not for the purposes of monetary damages. *Masonoff* v. *DuBois*, 336 F. Supp. 2d 54, 56 (D. Mass. 2004) (*Masonoff II*). Also, none of the defendants in this case were defendants in the *Masonoff* litigation. *Ibid.* The SECC superintendent and the Commissioner of Correction in *Masonoff* are successors of the defendants in the instant case. On September 11, 1995, the District Court judge, describing the conditions as "grossly unsanitary," granted the plaintiff class's motion for summary judgment on the "objective component" of the Eighth Amendment claim, i.e., that the use of chemical toilets violated the inmates' constitutional rights both because of the unsanitary conditions and the health problems caused by their use. *Masonoff I, supra* at 787-788, 797.[12] However, the judge denied summary judgment regarding the "subjective component" of the plaintiffs' claim because there remained triable issues as to whether the defendants were deliberately indifferent to the inmates' deprivation. *Id.* at 788, 797.

The defendants in *Masonoff* thereafter sought summary judgment on the ground of qualified immunity. On September 17, 2004, the District Court judge denied the motion as to the SECC superintendent and another administrator and allowed it as to the Commissioner. *Masonoff II, supra.* The judge treated the defendants differently because the DOC Commissioner "presumably did not have day-to-day contact with the operations and conditions at SECC, and there are no other facts in the record to support an inference of actual knowledge." *Id.* at 62.

*Discussion.* A. *Standard for summary judgment.* "[A] party moving for summary judgment in a case in which the opposing party [has] the burden of proof at trial is entitled to summary judgment if he demonstrates, by reference to materials described

---

[12]The judge found that the "defendants have not presented evidence which raises a genuine issue of material fact as to the existence of the conditions or health effects described in the inmates' affidavits." *Masonoff I, supra* at 796.

in Mass.R.Civ.P 56(c), [365 Mass. 824 (1974),] unmet by countervailing materials, that the party opposing the motion has no reasonable expectation of proving an essential element of that party's case." *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 716 (1991). See *Febus-Rodriguez* v. *Betancourt-Lebron*, 14 F.3d 87, 89 (1st Cir. 1994) ("[w]hen a defendant moves for summary judgment based on the doctrine of qualified immunity, the court must review the facts in the light most favorable to the plaintiff").

B. *Qualified immunity.* The plaintiffs appeal from the judge's decision that the defendants are protected from individual liability by the doctrine of qualified immunity, which "specially protects public officials from the specter of damages liability for judgment calls made in a legally uncertain environment." *Ryder* v. *United States*, 515 U.S. 177, 185 (1995).

"On a motion for summary judgment, 'the relevant question is whether a reasonable official could have believed his actions were lawful in light of clearly established law and the information the official possessed at the time of his allegedly unlawful conduct.' *Febus-Rodriguez* v. *Betancourt-Lebron*, [*supra* at] 91, quoting *McBride* v. *Taylor*, 924 F.2d 386, 389 (1st Cir. 1991)." *Clancy* v. *McCabe*, 441 Mass. 311, 317 (2004). Courts analyzing this defense must inquire, in the following order: "(1) whether the facts as alleged make out a constitutional violation; (2) whether that right was clearly established; and (3) whether a similarly situated reasonable official would have understood that her conduct violated clearly established law." *Masonoff II*, *supra* at 57, quoting from *Fabiano* v. *Hopkins*, 352 F.3d 477, 453 (1st Cir. 2003). See *Sabree* v. *Conley*, 62 Mass. App. Ct. 901, 902 (2004). The inquiry must be undertaken in sequential steps to ascertain the existence of qualified immunity; the establishment of what is (or is not) a constitutional right in one case governs the determination whether a right has been clearly established in a later case. *Saucier* v. *Katz*, 533 U.S. 194, 201 (2001).

1. *Constitutional violation.* In determining whether the constitutional prohibition against cruel and unusual punishment was violated, we evaluate "whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial 'risk of serious damage to his future health.' "

*Farmer* v. *Brennan*, 511 U.S. 825, 843 (1994), quoting from *Helling* v. *McKinney*, 509 U.S. 25, 35 (1993). The United States Court of Appeals for the First Circuit has established a three-part test for deliberate indifference: "[A] plaintiff must demonstrate 'deliberate indifference' by showing (1) an unusually serious risk of harm . . . (2) defendant's actual knowledge of (or, at least, willful blindness to) that elevated risk, and (3) defendant's failure to take obvious steps to address that known, serious risk." *Manarite* v. *Springfield*, 957 F.2d 953, 956 (1st Cir.), cert. denied, 506 U.S. 837 (1992). " '[D]eliberate indifference' is a stringent standard of fault, requiring proof that a [State] actor disregarded a known or obvious consequence of his action." *Clancy* v. *McCabe*, *supra* at 318, quoting from *County Commrs. of Bryan County* v. *Brown*, 520 U.S. 397, 410 (1997).

a. *Evaluation of risk of harm.* Determining whether an "unusually serious risk of harm" exists "requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to [the condition]. It also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Helling* v. *McKinney*, *supra* at 36. See *Good* v. *Commissioner of Correction*, 417 Mass. 329, 336 (1994) (consumption of contaminated water).

Citing substantial case law that disapproved of "confinement which requires persons to live in close proximity to their own human waste and that of others," the Supreme Judicial Court in *Michaud* found the procedure for emptying buckets to constitute cruel and unusual punishment in violation of the Eighth Amendment. *Michaud*, 390 Mass. at 529, 533. Although the court allowed for "interim ameliorative measures," i.e., the use of chemical toilets, it set a fixed date — June 1, 1984 — for the installation of flush toilets and sinks and described them as "constitutionally-mandated repairs." *Id.* at 535-536. Here, the plaintiffs have presented ample evidence detailing their health problems and the grossly unsanitary conditions at SECC beginning in the 1990's. In combination with Dr. Walker's 1982 study, the 1988 health code regulations, and the warning label

on the deodorizing chemical solution, this evidence is sufficient to create a triable issue of fact whether the conditions alleged regarding the chemical toilet and slop sinks threatened inmates' health and deprived them of "essential human needs, as those needs are defined by contemporary standards of decency." *Masonoff II, supra* at 58. See *Masonoff I, supra* at 797.

Additionally, we do not agree with the motion judge that the maintenance of the chemical toilets, as opposed to the use of chemical toilets, presents a separable issue that was not adequately raised. The plaintiffs' complaints and factual averments have been broad enough since the inception of the case to include the improper maintenance of the toilets (and the slop sinks). The plaintiffs have consistently depicted the waste disposal system as squalid and imprisonment in such conditions to be unconstitutional. Although they have also always contended that flush toilets were necessary to satisfy constitutional requirements[13] and that the Superior Court judge in the Langton decision erred when he held that chemical toilets and maintenance protocols were adequate when properly carried out, those positions in no way preclude them from arguing that the actual conditions of the toilets and slop sinks when they were not properly maintained were unconstitutional.[14]

b. *Actual knowledge of risk of harm.* The second prong of the Eighth Amendment test is subjective and addresses whether the defendants had actual knowledge of (or were willfully blind to) the substantial risk of harm to the health of the plaintiffs. *Masonoff II, supra* at 59-62.

We conclude that the record is insufficient to establish actual knowledge or willful blindness on the part of any of the defendants except Hall. Although it is a close question regarding Hall, there is a triable issue concerning whether he was

---

[13]Their litigation ultimately resulted in the installation of flush toilets.

[14]As the trial judge correctly recognized, the plaintiffs here were not parties to the action in the Langton decision and did not have an opportunity to be heard in that trial; consequently that decision has no collateral estoppel effect in the instant case. See *Green* v. *Brookline*, 53 Mass. App. Ct. 120, 123 (2001). See also *Masonoff I, supra* at 786, citing *Hermes Automation Technology, Inc.* v. *Hyundai Elec. Indus.*, 915 F.2d 739, 750 (1st Cir. 1990); *Mongeau* v. *Boutelle*, 10 Mass. App. Ct. 246, 249-250 (1980). The issue has not been raised on appeal.

aware of the harm and deliberately indifferent to it. *Masonoff I,* 899 F.Supp. at 797.

The record, when viewed in the light most favorable to the plaintiffs, establishes that Hall was the superintendent of SECC when the grossly unsanitary conditions described in the affidavits, and the associated health issues, should have been obvious to anyone observing SECC operations. See *Farmer* v. *Brennan, supra* at 842 ("a fact finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious").

During Hall's tenure, the Superior Court judge in the Langton decision had also established reporting procedures and placed primary responsibility for the proper maintenance of the toilets and slop sinks on the superintendent; therefore, Hall was on notice that he had to monitor these conditions with care. Finally, the record includes direct complaints from inmates to him about those conditions. Although he contests the existence of the conditions the inmates describe and recalls "personally receiving few, if any complaints about individual toilets," we cannot resolve these factual issues on summary judgment.

In contrast, there is insufficient evidence regarding Amaral to defeat the summary judgment motion. The affidavits essentially commence in the early 1990's after Amaral's tenure as superintendent. As specified in note 2, *supra,* Amaral retired either in 1989 or, at the latest, in October, 1990. The class consists of persons imprisoned in cells without a flush toilet at SECC after August 7, 1990. See note 8, *supra.* Even if Amaral was superintendent for two months after the class was certified, there are no specific references to his superintendency. There are also no affidavits in the record asserting that an inmate complaint was made to Amaral. Finally, Amaral left office prior to the entry of the order in the Langton decision on May 16, 1991.

In regard to the Commissioners of Correction, the evidence in the summary judgment record is also quite limited. There is no evidence to establish their actual knowledge of the squalid conditions the plaintiffs allege. The May 16, 1991, order requiring cooperation by the Commissioner also was not issued until after Vose left the Commissioner's office and within a month of Rapone's departure. As a result, summary judgment was properly

allowed for the two defendants who were Commissioners of Correction as well. See *Masonoff II, supra* at 62.

c. *Taking of available measures to reduce risk of harm.* Finally, the third prong of the Eighth Amendment test is subjective and focuses on whether the remaining defendant failed to take "easily available measures" to reduce the known risk to the plaintiffs' health. *Clancy* v. *McCabe,* 441 Mass. at 318.

The plaintiffs, in their affidavits, allege that the prison administrators did not do enough to seek funding for the flush toilets and did not respond promptly or properly to their complaints of damaged or broken chemical toilets. The inmates also claimed that they were often not supplied with such simple fixes as disinfectant and brushes to clean their Pak-A-Potties, and when they were, the brushes and cleaning supplies were inadequate. Further, the inmates reported having to brush their teeth and wash their faces in the same rooms that housed the slop sinks. They also had to wait in line to dump their waste and they would be splashed by other people's waste. Various inmates who were being disciplined alleged that they spent up to twenty-three hours per day and ate in their cells with their Pak-A-Potties. Inmates also claimed to have received filthy, previously used Pak-A-Potties.

The defendants argue that they have no responsibility for the lack of funding for flush toilets or the overcrowding that required SECC to remain open, and they dispute the allegations of slow maintenance and the lack of cleaning materials. Our response is two-fold. First, we agree that there is insufficient evidence to suggest that the defendants had any ability to impact the lack of funding or overcrowding problems. See, e.g., *Michaud,* 390 Mass. at 535 (defendants "present a convincing case that access to this money involves a process of legislative and executive decision making over which they had no control").

A different issue is presented regarding the maintenance of the chemical toilets and the slop sinks and related aspects of the waste disposal process. These issues, in contrast to issues of funding and overcrowding, pertain to "acts or omissions, *within* their control." *Masonoff II, supra* at 62. See *Cortes-Quinones* v. *Jimenez-Nettleship,* 842 F.2d 556, 561-562 (1st Cir. 1988)

("Even if the defendants *thought* they did not violate the decree in so far as compliance involved matters beyond their control . . . , we do not see how they could have believed it lawful to violate the decree . . . in respect to matters *within* their control").

Although Hall describes measures taken and orders given to make sure that the toilets and slop sinks remained sanitary, the plaintiffs describe the conditions as deplorable. Whether Superintendent Hall's alleged acts or omissions in this already problem-filled environment constitute deliberate indifference is not a simple matter to sort out. Nevertheless, as the First Circuit, in an opinion by then Judge Breyer, found:

> "Prison officials, working in these circumstances, understand that they are *not* liable for much of the harm that the system causes *only* because much of that harm involves matters beyond their individual control — appropriations decisions, for example, are in the hands of the legislature. . . . Yet that fact, in the context of an unconstitutionally dangerous system, should make reasonable officials increasingly sensitive to the need to avoid those acts or omissions, *within* their control, that might make matters worse."

*Ibid.* We conclude that although some of the problems were beyond the superintendent's control, the plaintiffs have presented sufficient evidence to create a triable issue of fact whether Superintendent Hall failed to take obvious steps within his control regarding the chemical toilets and slop sinks and other aspects of the human waste disposal process at SECC to reduce the known risk to the inmates' health.

2. *Clearly established constitutional rights.* Having considered whether there was an Eighth Amendment violation, we next consider, for purposes of qualified immunity analysis, whether the constitutional right violated was clearly established at the time. See *Clancy* v. *McCabe*, 441 Mass. at 317. In *Hope* v. *Pelzer*, 536 U.S. 730, 739 (2002), quoting from *Anderson* v. *Creighton*, 483 U.S. 635, 640 (1987), the United States Supreme Court held that "[f]or a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official

would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, . . . but it is to say that in the light of pre-existing law the unlawfulness must be apparent.' " See *Savard v. Rhode Island*, 338 F.3d 23, 27 (1st Cir. 2003), cert. denied, 540 U.S. 1109 (2004).

In 1982, the United States District Court for the District of Massachusetts held that a prisoner's right to "adequate and hygienic means to dispose of his bodily wastes" had been well established at the time of the plaintiff's incarceration in 1979. *Strachan* v. *Ashe*, 548 F. Supp. 1193, 1205 (D. Mass. 1982). A year later, the Supreme Judicial Court issued *Michaud.* See *Richardson* v. *Sheriff of Middlesex County*, 407 Mass. at 463 ("Indeed, this court, as well as several others, has held that the failure to provide an inmate with a toilet that can be flushed from within the inmate's cell constitutes cruel and unusual punishment in violation of the Eighth Amendment"). Other Federal circuit courts had similarly held, during the relevant period, that prisons must provide reasonably sanitary conditions for disposal of bodily waste. See, e.g., *LaReau* v. *MacDougall*, 473 F.2d 974, 978 (2d Cir. 1972), cert. denied, 414 U.S. 878 (1973) (provision of only a hole in cell's floor for defecation and urination "too debasing and degrading to be permitted"); *Ramos* v. *Lamm*, 639 F.2d 559, 568 (10th Cir. 1980), cert. denied, 450 U.S. 1041 (1981) ("state must provide . . . reasonably adequate ventilation, sanitation, bedding, hygienic materials, and utilities"); *Johnson* v. *Pelker*, 891 F.2d 136, 139 (7th Cir. 1989), quoting from *DeMallory* v. *Cullen*, 855 F.2d 442, 445 (7th Cir. 1988) (inmate's placement in cell without running water and in which walls were smeared with human feces fell below "threshold of decency ensured by the Eighth Amendment"); *Inmates of Occoquan* v. *Barry*, 717 F. Supp. 854, 866-867 (D.D.C. 1989), quoting from *Rhodes* v. *Chapman*, 452 U.S. 337, 347 (1981) (dilapidated and filthy bathrooms caused "serious deprivation of basic human needs").

Despite this montage of cases depicting unconstitutional human waste disposal conditions, the defendants point to the Langton decision and its subsequent affirmance by this court to il-

lustrate that the law was not clearly established during the relevant time period. The defendants also emphasize that two of the four defendants here, Vose and Amaral, were also defendants in the Langton litigation and the same prison facilities were involved. The Superior Court judge's findings of fact in the Langton decision are not, however, binding on the plaintiffs, who were not parties to that litigation and who depicted very different conditions. Nonetheless, as of the date of the Superior Court order on May 16, 1991, a judge who had made surprise visits to the SECC found that the conditions he observed did not constitute cruel and unusual punishment. This court affirmed, and on April 29, 1996, the Supreme Judicial Court denied the petition for further appellate review. *Langton* v. *Commissioner of Correction,* 422 Mass. 1108 (1996).

The Langton decision cannot, however, be viewed in isolation, but rather must be read in the context of a clearly established body of law defining grossly unsanitary human waste disposal conditions as cruel and unusual punishment. Although the judge in the Langton decision concluded that the chemical toilets and slop sinks that the judge observed in March of 1991 were not unconstitutional, "[The Langton decision] gave the defendants more than 'fair notice' that the portable toilets and slop sinks must be kept clean and well-maintained to pass constitutional muster." *Masonoff II, supra* at 65. If the conditions of the toilets and slop sinks disintegrated into obvious squalor after the time of the Langton decision, those conditions would violate a clearly established constitutional right.[15]

We conclude, as did the Federal judge in *Masonoff II,* that the record presented raises a genuine issue of material fact regarding whether the conditions of the chemical toilets and slop sinks did disintegrate and become deplorable after the time of the Langton decision.[16]

3. *Evaluation of public official's understanding whether conduct violated clearly established law.* We must then consider

---

[15]Hall served in office for more than two years after the time of the Langton decision.

[16]We also note that, unlike in the Langton decision, the undisputed facts here involved some prisoners required to spend as many as twenty-three hours per day in their cells with the chemical toilets and those same prisoners also had to eat in their cells. Finally, the Langton decision did not address the health issue associated with exposure to the chemicals used in the toilets.

whether a reasonable public official, situated similarly to defendant Hall, would have understood that his conduct violated clearly established law. *Harlow* v. *Fitzgerald,* 457 U.S. 800, 818-819 (1982). "Whether an asserted federal right was clearly established at a particular time, so that a public official who allegedly violated the right has no qualified immunity from suit, presents a question of law, not one of 'legal facts.' " *Elder* v. *Holloway,* 510 U.S. 510, 516 (1994). See *Rivera-Jimenez* v. *Pierluisi,* 362 F.3d 87, 95 (1st Cir. 2004). The defendants again argue that they relied on the 1991 Langton decision — and their attorney's opinion based on that ruling — that the conditions at SECC satisfied constitutional standards.

We conclude that if the conditions were as deplorable as the plaintiffs attest after the Superior Court judge reached his decision in May of 1991 and entered his order, a reasonable official would have understood that these conditions were unconstitutional. See *Masonoff II, supra* at 65 ("[The Langton decision] did not give SECC a clean bill of constitutional health into perpetuity. In other words, it would not be reasonable for the defendants to rely on [the Langton decision] — or advice of counsel — for the proposition that the conditions at SECC would always be constitutional, especially in the face of the court's warning in [the Langton decision] and its prophylactic order regarding cleaning and maintenance of the portable toilets").

Therefore, it was clearly established that, if the requirements of the May 16, 1991, order were not met, but rather, the conditions at the SECC deteriorated into squalor, incarceration at the SECC under those conditions would constitute cruel and unusual punishment. As a result, there is a genuine issue of material fact whether Hall is liable for any damages from May 16, 1991, until his departure in December, 1993.

*Conclusion.* Finally, we are left with the practical difficulty identified by the trial court judge of determining "whether the chemical toilets and slop sinks of the 1,945 members of the plaintiff class were properly maintained." As noted earlier, the class will be decertified upon the commencement of a trial. The number of claimants will also undoubtedly be substantially diminished as the time frame has been reduced, covering only the period of Hall's tenure as superintendent from May 16, 1991, until December of 1993.

Although the number of claimants and difficulty of proving individual liabilities or damages may still be daunting, they cannot be factors that bear on the legitimacy of the claims. The Superior Court is not without solutions to such difficulties. For example, this situation may call for the appointment of a master under Mass.R.Civ.P. 53, as amended, 386 Mass. 1237 (1982), to assist the court in determining issues of liability and damages. *Perez* v. *Boston Hous. Authy.*, 379 Mass. 703, 732, (1980), quoting from *Ex parte Peterson*, 253 U.S. 300, 312 (1920) (courts' "power includes authority to appoint persons unconnected with the court to aid judges in the performance of specific judicial duties, as they may arise in the progress of a cause").

Summary judgment should not have been granted for defendant Hall. There remains a genuine issue of material fact whether he was deliberately indifferent to the risk to the inmates' health after May 16, 1991, so as to constitute a violation of the Eighth Amendment. There are also issues of fact remaining pertaining to his defense of qualified immunity.

Insofar as the judgment dismisses the 42 U.S.C. § 1983 claim against defendant Hall, it is reversed. In all remaining respects, the judgment is affirmed.

*So ordered.*